322 S.W.3d 574 (2010)
In the ESTATE OF Charles Michael HOCK, Deceased
Susan Hanson, Petitioner-Respondent,
v.
Randy Dale Vanniewaal, Respondent-Appellant.
No. SD 30100.
Missouri Court of Appeals, Southern District, Division Two.
September 20, 2010.
*577 Richard L. Schnake, Neale & Newman, L.L.P., Springfield, MO, for Appellant.
John Cowherd, Mount Vernon, MO, for Respondent.
GARY W. LYNCH, Presiding Judge.
Randy Dale VanNiewaal appeals the judgment of the Circuit Court of Barry County in favor of the estate of Charles Michael Hock, upon its finding that Randy exerted undue influence to derive a benefit from Charles.[1] Finding no trial court error, we affirm.

Procedural Background
Charles died testate on July 1, 2007, at his home in Barry County at the age of sixty-four. He was survived by three daughters: Susan Hanson, who resided in California, and Julia Hock and Emily Hock, both of Chicago, Illinois. Pursuant to a will Charles executed two days before he die d, Charles's three daughters and Randy were named to share in the estate equally. Randy was appointed personal representative of the estate.
On August 27, 2007, Randy filed a claim against Charles's estate, requesting reimbursement in the amount of $8,277.84, which Randy claimed he paid for Charles's funeral expenses. In October 2007, Susan brought the underlying action for discovery of assets against Randy, in accordance with section 473.340,[2] alleging certain assets should be included in Charles's estate, but were unlawfully obtained by Randy "by fraud and/or undue influence or at a time when [Charles] did [not] have sufficient mental capacity" to give said property to Randy. In part, Susan alleged that proceeds from two bank accounts owned by Charles were assets of the estate and had been adversely withheld or claimed by Randy.
In its judgment, the trial court found that Randy's exercise of undue influence caused certain bank accounts to be created in the joint names of Charles and Randy and further caused the balance of funds from Charles's individual account to be paid over to Randy and deposited into Randy's individual account and later spent. The trial court entered judgment in favor of the estate and against Randy in the amount of $46,265.52. The trial court also denied Randy's claim for reimbursement of Charles's funeral expenses because it found that the funds Randy used to pay this expense came from from one of the bank accounts that actually belonged to the estate.
Randy timely appealed.

*578 Factual Background

After on-the-job knee and back injuries forced his retirement as a firefighter[3] in Chicago around 1995, Charles moved to the Eagle Rock area, where he purchased a home situated on several acres of lakefront property. Charles's three daughters visited during vacations and around holidays. Charles and his daughters called one another frequently.
Charles became friendly with Randy and his wife, Earleen, following the funeral of Charles's sister some time around 2000. Earleen was Charles's niece. At first, Randy and Earleen, who were from Iowa, would come to visit in the summer and stay about a week. Nearby his residence, Charles had a cabin or guest house where Randy and Earleen often stayed during their visits. Charles told his daughter Julia that Randy was his plumber, a guy who worked for him, and that once in a while during the summer Randy would come and do odd jobs around the house and fix the plumbing. Julia met Randy about two and a half years before her father's death. After January 2007, Julia often heard from her father that Randy was there for a visit, and Randy's visits became more frequent in the last few months of her father's life.
At the time of his death, Charles was the owner of a checking account and a money market account at Commerce Bank in Eagle Rock. The checking account was owned jointly by Charles and his close friend and caregiver, Cathryn Walker. Walker assisted Charles with paying his bills and signed Charles's personal checks after Charles sustained serious injuries and lost the use of his right hand following a fall and a lengthy hospitalization in February 2002. Walker continued to help Charles with payment of his bills until his death. On the date Charles die d, the checking account had a balance of approximately $9,400.00.
Two days following Charles's funeral, Randy contacted Walker and asked her for the funds in Charles's checking account. Randy told her he was going to pay Charles's bills and would open an account for Charles's daughters with what was left. Walker gave him a signed check, which he made payable in the amount of $9,400.00, leaving a balance of $135.58 in the checking account. Randy deposited $9,400.00 into an individual bank account in his name only on July 6, 2007. On December 10, 2007, Randy withdrew $5,500.00 from this account. Later, on January 6, 2008, Randy withdrew another $400.00. No account was established for the benefit or in the names of Charles's daughters.
The money market account was established on January 19, 2007, after Charles, transported and accompanied by Randy, visited his bank, closed a savings account he had co-owned with Walker, and deposited the funds from that account into the new account, naming Randy as co-owner. On the date of Charles's death, the balance in the money market account was approximately $48,643.36. On July 2, 2007, the day after Charles died, Randy withdrew $25,000.00 from this money market account. The next day, Randy withdrew $10,000.00. An additional $5,356.52 was withdrawn from the account by Randy on July 31, 2007. On August 1, 2007, a check for $8,277.84 made payable to Fohn Funeral Home was presented for payment from the money market account. Randy testified this was payment for Charles's funeral expenses. As of August 23, 2007, the remaining balance in the account was $15.24.
Additional facts will be set forth hereafter as necessary to discuss Randy's first point.

*579 Standard of Review

Upon review of the judgment in a discovery of assets proceeding, the judgment will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Estate of Herbert v. Herbert, 152 S.W.3d 340, 344 (Mo.App.2004). Where there has been no request for findings and conclusions, it is presumed that the trial court's findings are in accordance with the judgment entered, and the judgment will be affirmed under any reasonable theory supported by the evidence. Id.

Discussion
In his first point, Randy claims that the trial court's finding that the creation of his co-ownership in the money market account was the result of his undue influence upon Charles is not supported by substantial evidence, in that, first, the testimony of the bank representative who assisted Charles on January 19, 2007, in opening the money market account, "established that [Charles] acted on his own, was not under [Randy's] influence, and understood the consequences of his action in re-titling the money market account [.]" Second, Randy further challenges the trial court's finding of undue influence, asserting that Charles's "actions were consistent with his testamentary intent" and that "neither [Randy's] closeness to [Charles] nor his presence during the banking transaction supports a finding of undue influence."
"Undue influence itself is usually defined as `such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another.'" Duvall v. Brenizer, 818 S.W.2d 332, 335 (Mo.App. 1991) (quoting Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 67 (Mo.1943)). "Also, in determining whether there is evidence of undue influence, the court does not have to find the testator or grantor to be of unsound mind, ... therefore, one may be unduly influenced while still mentally competent." Id. (internal citations omitted).
A determination of whether undue influence was exercised requires a case-by-case analysis. In the Estate of Gross, 840 S.W.2d 253, 257 (Mo.App.1992). "`The cases recognize that undue influence is seldom susceptible of direct proof and that generally it must be deduced from the circumstances of the particular case.'" Landers v. Sgouros, 224 S.W.3d 651, 660 (Mo.App.2007) (quoting Reeves v. Boone, 591 S.W.2d 118, 121 (Mo.App.1979)). "Undue influence is not proclaimed from the housetop and direct proof is difficult, if not impossible, to obtain." Dobbins v. Hupp, 562 S.W.2d 736, 741 (Mo.App.1978). "`Persons exerting undue influence will do so in as subtle, furtive, indirect and elusive a manner as possible and such influence may therefore be shown indirectly by the reasonable and natural inferences drawn from the facts and circumstances proved.'" Duerbusch v. Karas, 267 S.W.3d 700, 708 (Mo.App.2008) (quoting Estate of Gross, 840 S.W.2d at 257). "It is impossible to set forth a rigid formula of what facts must be established to make a submissible case of undue influence by circumstantial evidence." Id.
Nevertheless, "[a] presumption of undue influence arises in discovery of assets cases where substantial evidence shows (1) a confidential and fiduciary relationship; (2) benefaction to the fiduciary; and (3) some additional evidence from which undue influence may be inferred." Estate of Gross, 840 S.W.2d at 257. Once established, the presumption makes a prima facie case of undue influence, effectively shifting the burden to the fiduciary to rebut. Id.
*580 In his first point, Randy does not challenge the evidentiary basis supporting that he had a fiduciary and confidential relationship with Charles or that he received a benefit from Charlesthe first two prongs supporting the presumption of undue influence. Rather, Randy solely challenges the evidentiary support for the third prong of the undue influence presumptionthe existence of some additional evidence from which undue influence may be inferredas related to Charles's titling of the money market account and the funds deposited in that account by Charles to include Randy as co-owner. In support of this challenge, Randy limits his argument to three specific areas of evidence presented at trial. By so limiting his argument, Randy has failed to demonstrate that the trial court's finding of undue influence is not supported by substantial evidence.

Randy fails to demonstrate that the trial court's judgment is not supported by substantial evidence
Randy's argument first focuses upon the testimony of bank employee April Beaulieu who assisted Charles when the money market account was created. In her testimony, Beaulieu recalled the transaction on January 19, 2007. She remembered that Charles "seemed to be clear in his mind" and "in good mental condition" and although he appeared frail and elderly, she did not consider his mental state or his mental capabilities frail. Charles introduced Randy to Beaulieu and stated that he wanted Randy on his account. She recalled obtaining the necessary information from Randy but had no further conversation with him. Beaulieu further testified that Charles did not seem to be under Randy's influence. When asked about her impression of Charles's "mental functioning," Beaulieu stated, "To me, he always seemed straightforward, and ... he seemed to be on track with what he was thinking and saying to me." Beaulieu believed that Charles understood the consequences of his decision to include Randy on the account. When asked if she knew how the decision was made to establish a joint account as opposed to a "P.O.D.," Beaulieu testified, "I think it was probably predetermined before they came in."
Next, Randy's argument relies upon the testimony and actions of attorney Don Cupps. According to Cupps, six to eight months before Charles died, Charles met with him to discuss drafting a new will or estate plan. At that time, Charles contemplated leaving half of his real estate to Randy and half of his real estate to Susan, "and ... everything else to Susan." If Charles had wanted to execute a will that day, Cupps would have felt comfortable witnessing it for him. Two days before Charles died, Cupps witnessed the execution of Charles's will, swearing that Charles "signed and executed the instrument as his Last Will, and that he had willingly signed, and that he executed it as his free and voluntary act for the purposes therein expressed." Randy argues that Charles's action in adding Randy's name to the money market account was consistent with his estate plan as Charles had related it to Cupps and was not the result of undue influence on Randy's part.
Finally, Randy argues that "[t]he fact that two people have a close relationship, and the fact that one is present when the other does a banking transaction, does not mean that the one unduly influences the other."
By addressing only these three specific areas of the evidence, Randy has completely failed to demonstrate that the trial court's finding of undue influence was not supported by substantial evidence.
A not-supported-by-substantial-evidence challenge requires completion of three sequential steps:

*581 (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
(2) identify all of the favorable evidence in the record supporting the existence of that proposition; and,
(3) demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.
Houston v. Crider, 317 S.W.3d 178, 187 (Mo.App. S.D.2010).
Here, rather than identifying evidence favorable to the trial court's finding, Randy has identified contrary evidence that is favorable to his position. Likewise, rather than demonstrating how the evidence favorable to the trial court's finding of undue influence does not have probative force, Randy has attempted to demonstrate why his identified contrary evidence supports a judgment in his favor. Neither of Randy's actions fulfills the second and third steps necessary to demonstrate that the trial court's finding of undue influence is not supported by substantial evidence. In order to prevent us from becoming an advocate for Randy by supplying these missing steps ourselves, their omission requires that his point be denied. Id. We have, nevertheless, conducted an ex gratia review of the record and determined that the trial court's finding of undue influence is supported by substantial evidence.[4]

The trial court's finding of undue influence is supported by substantial evidence
"A circumstantial case of undue influence is not made by establishing any one factor." Ruestman v. Ruestman, 111 S.W.3d 464, 479 (Mo.App.2003). To establish an inference of undue influence, it is not necessary to show that Randy exerted his influence over Charles at the exact moment of the transaction. See Landers, 224 S.W.3d at 661; Robertson v. Robertson, 15 S.W.3d 407, 413 (Mo.App. 2000); Estate of Gross, 840 S.W.2d at 258. "What is required is proof of facts from which an inference can arise that the undue influence was an active factor in the transaction." Bolin v. Anders, 559 S.W.2d 235, 241 (Mo.App.1977).
Evidence demonstrating that a "fiduciary actively procured a transfer to a personal benefit" may establish an inference of undue influence. In re Estate of Stanley, 655 S.W.2d 88, 90-91 (Mo.App. 1983). "[A]ctive procurement will be inferred" where there is evidence that the fiduciary had some power to influence the grantor, where the opportunity to do so is present, and where the disposition of the property was a changed course of action or a departure from the estate plan. Estate of Gross, 840 S.W.2d at 258.
Evidence of the grantor's mental and physical condition is "`highly material' on the issue of undue influence [,]" Robertson, 15 S.W.3d at 413, and relevant to prove the grantor's "`susceptibility to the persuasion of undue influence.'" Landers, *582 224 S.W.3d at 661-62 (quoting Bolin, 559 S.W.2d at 241).
Charles primarily lived by himself, but following his fall in 2002, in addition to needing help writing, he required assistance with housework, visits to the doctor, grocery shopping, cooking, and he often required a cane to walk. Cathryn Walker assisted Charles with financial matters and cared for Charles on a daily basis following his fall. Charles's physical condition gradually deteriorated, and he increasingly relied on a wheelchair for mobility and special equipment to enable him to bathe. He had fractured some ribs in 2004 and fractured a hip in June 2005, and experienced chronic back pain. In his last few years, he suffered from syncope, anemia, COPD, congestive heart failure, and had several small strokes. He received assistance and therapy from home health care providers.
There was considerable evidence that Charles's physical and mental condition deteriorated significantly in the last year of his life. Walker testified that she discontinued daily visits to Charles some nine months prior to his death after she noticed changes in Charles's behavior that were out of character for him. She continued to visit him once a week to check on him and helped him pay his bills once a month. She stated that Charles had become nasty and argumentative; he was forgetful and did not remember things he said or did. Walker also noted deterioration in his physical condition and believed that Charles no longer ate like he should have and drank more. Julia testified that she had constant contact with Charles in the year preceding his death and also noticed that Charles had become weak and frail and needed a lot of help getting around the house. She also noted that he was quite forgetful and was easily frustrated and agitated. Randy, too, testified that in his last six months, Charles was often in pain, could not walk very well, and sometimes needed a wheelchair and a cane.
By all accounts, Charles was a heavy drinker. Medical records report a diagnosis of alcoholism. Walker testified that Charles often drank to excess, he was intoxicated on a daily basis, and he would frequently call Randy when he got drunk. Julia also testified that her father had a long-standing problem with alcohol, that he suffered from alcohol abuse, and that he had trouble remembering things, which she attributed, in part, to his drinking. Julia further testified that in the last year, Charles was very easily influenced by alcohol and was "very dependent on it in the end." She noted that if someone would give him a beer or some vodka, he would do whatever they wanted. Randy, too, described Charles as a heavy drinker and stated that Charles had required air transport to the hospital a few times as a result of his drinking binges. Randy considered Charles to be an alcoholic. Nevertheless, Randy and Charles drank together every day when Randy would visit.
Randy testified that Charles knew his health was failing and said that because of his problem with alcohol, his family had in the past threatened "to put him in a home and get him dried out [.]" When Charles discussed appointing Randy as his attorney-in-fact, Charles directed Randy that he did not "want to be stuck in a home [,]D" and Randy promised Charles that he would not allow it. Charles appointed Randy his attorney-in-fact when he executed a power of attorney in January 2006. Julia testified she never knew that Charles had named Randy attorney-in-fact.
Charles's niece, Sharon Hurley, who had helped with cleaning Charles's house after he moved to the area, testified that she kept in close contact with Charles following his fall in 2002, calling him daily and visiting once a week. However, in the *583 eighteen months preceding Charles's death, when Randy and Earleen were frequent guests of her uncle, Sharon began to have trouble contacting Charles, and eventually she began to feel like she had been cut off from contact with him. She stated that initially Randy or Earleen would answer the telephone when she called and make some excuse as to why she could not talk to Charles. After a while, the answering machine was disconnected so that when she called, she could no longer leave him a message. When she did go to the house, she was met by Randy or Earleen, who told her that Charles was sleeping, and she was not allowed inside. When she became concerned about the frequent partying going on when Randy and Earleen visited Charles, Sharon contacted authorities to request a "well-being check" on her uncle. During the last six months of his life, Sharon ceased trying to visit Charles because she could not get in to see him. The last time she saw her uncle alive, he was with Randy and Earleen at a local pub at 11:00 a.m. on a Sunday morning, seated at a table filled with beer bottles, and he was intoxicated.
Another factor bearing upon the trial court's finding of undue influence is evidence that indicates a changed course of action, Duerbusch, 267 S.W.3d at 709, or an unnatural disposition of one's estate, Landers, 224 S.W.3d at 662, sufficient to establish active procurement. A finding of an "unnatural disposition of property" may be based on evidence of a transfer of property without apparent reason, to non-blood heirs [,] excluding the natural objects of one's bounty. Ruestman, 111 S.W.3d at 481.
As previously noted, by viewing the evidence and the inferences drawn therefrom in the light most favorable to his position, Randy contends that Charles "acted consistently with what he told his attorney, Don Cupps, that he wanted to do with his estate plan [,]" which, as Randy interprets for us, would have been "leaving half of his real estate to Randy and half to Susan, and everything else to Susan." However, from the record before us, Charles made his intentions regarding the disposition of his estate known to others, who testified to the contrary. Here, there was substantial evidence from which the trial court could find a changed course of action from Charles's previously stated estate plan.
There was evidence in the record that Charles had executed a beneficiary deed, dated July 21, 2003, transferring his interest in his lakefront real property, a house, and a cabin to his daughter, Susan, upon his death. Julia Hock testified that the real property indeed passed to Susan and that Susan was in the process of including the two other daughters in the deed, as her father had instructed.
In a will Charles executed July 21, 2003, revoked upon execution of the subsequent will two days before he die d, he appointed his daughter, Susan, as personal representative and named her as sole heir. Julia testified that before January 2007, Charles told her that he named Susan executor of his estate and that everything was to be divided three ways.
When Charles discussed his estate plan with Julia in April 2007, he told her he would make Randy personal representative, and Randy would make sure that everything would be left to the three daughters and would be divided three ways. She did not become aware Charles had named Randy as attorney-in-fact or established a money market account in his and Randy's names until after her father's death.
On June 29, 2007, two days prior to his death, Charles executed a last will and testament, revoking the previous 2003 will. The attorney who prepared the new will, Don Cupps, testified that Randy either *584 called or stopped by his office in late June 2007, "needing the Power of Attorney because [Charles] was in bad shape [,]" and inquired whether Charles "got everything... done that he needs to ... have done." At that time, Cupps pulled Charles's file and found notes indicating that Charles had not completed a contemplated revision to his estate plan that Charles discussed in a previous appointment. Cupps told Randy that Charles "had never come back." Cupps thereafter visited Charles at his home two days prior to Charles's death, and a new will was executed. In the new will, Charles appointed Randy as personal representative of his estate, named his three daughters and Randy as heirs, and divided his estate into four equal shares between his three daughters and Randy. Randy was present during the execution of the new will.
Cathryn Walker described Charles as a "tightwad," and "very tight," who was not the type who would give his property away. She also testified that up until January 2007, Charles directed her that his money "was to go to his girls." She further testified that Charles told her that she was to set up a fund for his three daughters with the balance left in his savings account, which was later closed and the funds transferred to the money market account. After Charles opened the money market account and named Randy as co-owner in January 2007, Charles told Walker that Randy was going to "look over the money" and that she was to sign what was necessary, and they would open an account for the benefit of the girls. Randy was to see to it that they got the money when they needed it; Charles did not want them to blow the money. However, no such account was established, and Charles's daughters never received any portion of the funds in the account. Randy had dissipated the money he withdrew from market account by the time of trial. He claimed he bought a four-wheeler, went fishing and hunting, and spent some of the money gambling.
"In a discovery of assets case, the court must determine the nature, value and extent of the property adversely held by defendant, as well as the persons who have an interest in the property." Estate of Gross, 840 S.W.2d at 260. "In identifying the property adversely held, the court may determine defendant's handling and transferring of the property to be relevant, whether or not such activity occurred before, during or after the alleged undue influence." Id. Here, certain actions by Randy following Charles's death may be viewed as inconsistent with Randy's contention that Charles intended that he receive the funds from the money market account.
Just after Charles die d, Randy asked Cathryn Walker to sign a check over to him from Charles's checking account so he could pay the house payment and utility bill. He told Walker he was going to open an account for Charles's daughters with what remained. Walker told Randy that "that's what I was supposed to do and he said he'd take care of it." Walker signed a blank check, and Randy made the check payable to himself in the amount of $9,400.00 two days after Charles's funeral. No account was ever established for the benefit of Charles's daughters. Randy testified that Charles probably did not mean for Randy to have the funds from the checking account and that he asked Walker for that money because he was named personal representative.
Julia testified that she arrived at her father's house the day following his death to discover Randy and others in the midst of a party, drinking beer and playing music. They indicated that they did not know she would be arriving so soon. When she noticed that her father's truck was gone, she asked Randy about the truck, and he *585 told her Charles had sold it. She disputed his explanation and told him that someone else had told her that the truck was there that morning. Randy then told her that he had loaned the truck to someone to move furniture. The truck was returned two days later and only after Julia threatened to call the police.
Randy, who continued to stay in the cabin over the week following Charles's death, had allowed two other men to stay in Charles's house but would not ask them to leave when Julia and her family arrived. Julia and her family checked into a hotel because they could not stay at the house with the drinking and smoking occurring there; her daughter is asthmatic and her mother had undergone a heart transplant. When Randy and Earleen left, Randy never returned the only key to the cabin. In November 2007, Julia discovered that everything had been removed from the cabin, including light switch covers and light bulbs.
When Julia inquired regarding Charles's bank accounts, Randy told her he had it all under control, not to worry about it, and he would talk to her about it when he was ready. After that conversation, however, Randy refused to talk to Julia about the bank accounts, and she never saw any money from her father's accounts. Initially, Randy, who had possession of the will executed two days before Charles's death, refused to show Julia the will until her mother "had words with" Randy.
Randy testified that he did not pay for Charles's funeral out of the funds remaining in Charles's checking account because "[t]here wasn't enough money for that." Randy submitted a claim to the estate for reimbursement of Charles's funeral expenses in the amount of $8,277.84. There was testimony that the balance in Charles's checking account at that time was at least $9,400.00.
Randy withdrew $25,000.00 from the money market account on July 2, 2007, one day following Charles's death. While Randy testified that he did not withdraw any money until after he "went and saw Mr. Cupps [,]" who suggested he "go get it [,]" the evidence was that Randy did not see Cupps until July 3 at 2:30 p.m. Cupps's file notes indicated that on that date, when he called Commerce Bank to ascertain the balance in the account, at the time he called, the balance had already been reduced to $23,000.00. Randy withdrew another $10,000.00 from the account on July 3, 2007.
As previously noted, Randy contends that his friendship with Charles and his presence at the time Charles converted his savings account to a money market account co-owned with Randy does not support a finding of undue influence. Randy cites two cases, Dickinson v. Dickinson, 87 S.W.3d 438 (Mo.App.2002), and In re Estate of Davis, 954 S.W.2d 374 (Mo.App.1997), to support this claim. Both cases held that a beneficiary's mere involvement and presence during the transaction did not support a finding of undue influence unless the beneficiary had a coercive influence greater than that of a regular family relationship. Dickinson, 87 S.W.3d at 443; Estate of Davis, 954 S.W.2d at 379-80. However, "`[f]actual situations are subject to such a myriad of variations that any one case is of limited precedential value.'" Duerbusch, 267 S.W.3d at 708 (quoting Estate of Gross, 840 S.W.2d at 257). Here, there was additional substantial evidence of the history and circumstances of Randy's non-familial relationship and involvement with Charles that gave rise to an inference of undue influence aside from Randy's involvement and presence during the transaction creating the money market bank account.
*586 "`Courts have adopted a liberal attitude regarding the quantum of evidence necessary to establish that the fiduciary was actively concerned in some way which caused or contributed to cause the execution of the instrument.'" Godsy v. Godsy, 504 S.W.2d 209, 213 (Mo.App.1973) (quoting Pasternak v. Mashak, 392 S.W.2d 631, 637 (Mo.App.1965)). The instrument in this case was the account document naming Randy as co-owner of the money market account. Here, there was evidence that Charles was a known alcoholic, that he would do whatever anyone wanted him to do in exchange for more alcohol, and that while they were together, rather than discouraging Charles from drinking, Randy appeared to condone and encourage his drinking. Charles's alcoholism and Randy's encouragement of that disease alone is sufficient to raise a reasonable inference that Charles was vulnerable to influence exercised by Randy.
There was further evidence of Charles's testamentary intent that his money was to be left to his daughters with Randy managing the funds for their benefit. Randy's actions following Charles's death, including: Randy's refusal to discuss the disposition of Charles's money market account with Julia; the disappearance of items of Charles's personal property, particularly the disappearance and reappearance of the pickup truck that Randy told Julia Charles had sold; Randy's representation to Cathryn Walker that he would pay the bills and establish an account for Charles's daughters with the remaining balance in Charles's checking account, which never occurred; and the inconsistencies in Randy's chronology of when he was advised to remove funds from the money market account are "indicia of undue influence under the developed law as to the quantum of evidence required to show active procurement of the property by the fiduciary." See Estate of Stanley, 655 S.W.2d at 91.
"The trial court is free to believe none, part, or all of any witness's testimony." Cordes v. Williams, 201 S.W.3d 122, 133 (Mo.App.2006). "The trial court may be clearly convinced of the affirmative of a proposition even though it has contrary evidence before it." In re Estate of Dawes, 891 S.W.2d 510, 523 (Mo.App. 1994). Although evidence contrary to the trial court's findings may have been presented, the trial court judges the credibility of the witnesses before it, and the facts are reviewed in the light most favorable to the judgment. Id. Having reviewed the evidence in that light, we determine that the trial court's finding that Randy obtained the benefit of the money market account by exerting undue influence upon Charles is supported by substantial evidence. Randy's first point is denied.

Randy's claim for funeral expenses is moot
Randy's second point relates to his claim against Charles's estate in the amount of $8,277.84, seeking reimbursement of monies he purportedly advanced to pay for Charles's funeral expenses. The trial court ordered Randy's claim against the estate for reimbursement of Charles's funeral expenses "satisfied as a result of the payment of said sum from funds that now have been decided to be the assets of said estate [.]"
In his point, Randy contends that the trial court erred in denying his claim for reimbursement for Charles's funeral expenses because the claim was timely filed and because Randy paid the expenses out of his own money. Randy argues, "The trial court's denial of [Randy's] claim against [Charles's] estate for reimbursement of ... the funeral expenses rests squarely on its erroneous conclusion that undue influence tainted the re-titling of the money market account. Because that conclusion *587 was wrong, the denial of the claim was likewise error."
Our determination that the trial court's finding of undue influence was not erroneous in the discussion of Randy's first point renders his second point moot. It is denied.

Decision
The trial court's judgment is affirmed.
SCOTT, C.J., and FRANCIS, J., concur.
NOTES
[1] Because some family members bear the same last names, we use first names for clarity. No familiarity or disrespect is intended. Randy was married to Charles' niece, Earleen, who was originally named as a co-defendant in the underlying action. The trial court entered judgment on the petition in Earleen's favor. That judgment has not been appealed.
[2] References to section 473.340 are to RSMo 2000.
[3] According to Julia, Charles's knees were injured when he fell through a collapsing floor while saving the lives of a father and son from a fire.
[4] A not-supported-by-the-evidence challenge to the trial court's undue influence finding required that Randy demonstrate to this Court why the evidence in the reminder of this opinion, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the finding of undue influence such that the trial court could not have reasonably decided that Randy exerted undue influence upon Charles to procure co-ownership of the money market account. See Houston, 317 S.W.3d at 187. Randy does not address this evidence in his point relied on or in his argument.