John P. DUERBUSCH, Jr., as Personal Representative of the Estate of Marcella M. Karas, Deceased, John P. Duerbusch, Jr., Individually, Joseph J. Duerbusch, Individually, and Thomas H. Duerbusch, Respondents,

v.

Donald KARAS, Appellant.

No. ED 88883.

Missouri Court of Appeals, Eastern District, Division Five.

June 10, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 15, 2008.

Application for Transfer Denied Nov. 25, 2008.

---

Robert J. Maurer, Clayton, MO, for appellant.

John C. Garavaglia, Clayton, MO, for respondents.

PATRICIA L. COHEN, Chief Judge.

### Introduction

Donald Karas ("Karas") appeals from the judgment of the Circuit Court of the City of St. Louis in favor of John, Joe and Thomas Duerbusch ("Duerbusches") awarding damages of $580,822.55 on their claim that Karas used undue influences to obtain survivor benefits from Marcella Karas ("Decedent"). Karas contends the trial court erred because: (1) insufficient evidence supported the judgment; (2) the trial court abused its discretion in allowing expert testimony; and (3) the trial court lacked jurisdiction to enter an amended judgment more than thirty (30) days after the entry of the final judgment. We affirm.

### Facts and Proceedings Below

Decedent died intestate on September 22, 1996. Her sole heirs were three nephews John, Joe and Tom Duerbusch, the children of her predeceased brother. Following Decedent's death, a probate estate opened in the Circuit Court of the City of St. Louis, which contained the two houses owned by Decedent. John Duerbusch was appointed personal representative of the estate. At the time of her death, Decedent also possessed a total of twenty-two separate bank accounts, 1,463 shares of Union Electric stock, a safe-deposit box and an annuity with Western–Southern Life Assurance Company. The accounts and investments had an aggregate value of approximately $1,161,279 and contained payable on death ("POD") designations to Karas, her nephew through marriage. Following the opening of the probate estate, the Duerbusches filed a Petition to Discover Assets in the Circuit Court alleging among other things, that Karas used undue influence to obtain survivor benefits from Decedent.

In June 2006, the case proceeded to a jury trial. The Duerbusches argued that Decedent's dependence upon Karas allowed him to exercise undue influence over the disposition of her accounts and investments. They asserted that Decedent had difficulty making financial and practical decisions on her own, having been raised as a "traditional-style" woman with a limited education, and depending upon various male relatives to assist her in her daily life. Once both her husband and brothers died, the Duerbusches argued, Decedent began to depend upon Karas to do everything from taking her to the store and the bank to assisting her around her home to making financial decisions.

The Duerbusches each testified that the Duerbusch family had a tradition of at-

tempting to avoid probate, based on a concern that a probate estate would cost too much in court and attorney fees. As a result, they claimed, relatives would appoint another relative as an "executor" of their estates, which was merely a formal name for a person they trusted, and they would jointly file their bank accounts and other property with the "executor" so that the "executor" would pay the bills and the funeral expenses and divide the remaining assets among the heirs.

The Duerbusches also testified that while they repeatedly saw Decedent while growing up, she stopped attending family functions and began to spend more time with Karas and his family after her husband and brother died. Around this time, they noted, Decedent began to speak more and more about Karas, where she had not in the past, stating, "What would I do without Donnie?" Moreover, they noted, Karas began to run errands with Decedent and assist her around the house.

John Duerbusch testified that he had a close relationship with Decedent, who was his godmother. John stated that he began to visit and contact her more after her husband and brother had both passed away. On one occasion, he stated, Decedent asked him to come over to her house to fix clogged sinks, which were clogged because she had gone without hot water for six to eight months. John testified that, at one point, Decedent suggested that she ought to put his name on her accounts, but that he hesitated and suggested to her that they should wait and think about it. After that, Karas began taking her to the bank and John never took her again.

John further testified that in the year before Decedent died, Karas had far more contact with her than anyone else. John stated that very few people visited Decedent and Karas was at her house "all the time," spending almost every night there until she passed away. According to John, once Karas became more involved, Decedent refused to go to the hospital when she became ill because she was afraid her house would be robbed while she was away. John also contended that Decedent allowed Karas to lock her inside her home when he left for periods of time because she was concerned about her safety. Lillian Duerbusch, the widow of Decedent's cousin, testified that in August 1996, she had difficulty getting Decedent on the telephone and that when she went to visit Decedent at her home Karas acted as if he was going to block her from entering.

In addition to assisting with her shopping and necessary errands, Karas also assisted Decedent with health care, financial and legal matters. Towards the end of her life, Decedent developed problems with her legs, feet and breathing. Karas arranged for his doctor, Dr. Felder, to see Decedent in her home.[1] Debra Teson, the nurse who provided home health care for Decedent, kept written notes regarding her daily neurological assessment, which describe Decedent's recall as "poor after five minutes and states 'I'm in such a dither with this new routine. I can't retain it all.'" In the area of her notes entitled "Neurological," Ms. Teson also described Decedent as: "forgetful," "flat affect," "disorganized," "depressed," and "in-

---

1. Dr. Felder diagnosed Decedent with congestive heart failure, with a possible history of myocardial heart attack and treated her in her home with the assistance of a home health care nurse and nurses' aid. At the time he treated her, Dr. Felder lacked admitting privileges at any area hospital, had a limited medical license and was on probation with Missouri Board of Healing Arts ("MBHA"). Dr. Felder did not send any written bills to Decedent, but received cash payment from Karas. At the time of trial, the MBHA had revoked his license to practice medicine.

ability to recognize problems." Ms. Teson expressed concerns with the neighborhood, the living arrangement between Decedent and Karas, and with Decedent being left alone in the house.

Decedent hired Karas' attorney, who drafted a durable power of attorney for health care decisions naming Karas as attorney-in-fact and an additional document providing Karas authority to make decisions concerning Decedent's real estate. Although Decedent had previously used her brother's accountant, she began to employ Karas' accountant to prepare her taxes.

On December 14, 15, and 18, 1995, Karas took Decedent to Magna Bank, Roosevelt Bank, Pulaski Bank, Boatmen's Bank and Union Electric.[2] During those three days, Decedent made all of her accounts—including her Union Electric stock—payable on death to Karas. In addition, Decedent titled one of her accounts jointly with Karas so that he could use the account to pay for her bills, medicine and groceries.[3] In June 1996, Decedent closed two of her Roosevelt accounts and used the proceeds to purchase an annuity from Western–Southern Life Assurance Company. She listed Karas as the beneficiary after Karas spoke to a representative at the bank about the annuity. In spite of these transfers, Decedent told Mrs. Duerbusch, Mrs. Gonzalez and John Duerbusch that she wanted to split her assets between Karas and John Duerbusch. John

Duerbusch testified that approximately ten days before she died, Decedent told him that she did not intend for Karas to become the owner of her property but that she wanted to use her property to take care of both John and Karas and that Karas knew her wishes.

John testified that on the night Decedent died, Karas came to his home and told him that he would pay his home mortgage because Decedent would have wanted him to do it. John asked Karas about the rest of the money but Karas stated that they would talk about it later and immediately left. Approximately one week later, Karas closed all of Decedent's accounts, filed a claim for the proceeds of the annuity and transferred the title on the stock to his name. Prior to closing the accounts, Karas purchased twenty-four death certificates, the exact number of accounts and investments that Decedent possessed. Following the closing of the accounts and the re-titling of the investments, Karas received approximately $1,161,279 from Decedent's accounts and investments.

Dr. Sean Yutzy, a forensic psychiatrist testifying on behalf of the Duerbusches, opined that Decedent had been at a substantial risk of undue influence at the time she granted Karas survivorship benefits. In so concluding, Dr. Yutzy relied on Decedent's long-standing history of dependency, upbringing, lack of education, failure to learn how to drive, tendency to procrastinate, ill health, and "unusual behaviors."[4]

2. Each bank held accounts that Decedent had inherited from her brother Bill or sister Loretta and were titled jointly in the name of Decedent and either Bill or Loretta. Following Bill and Loretta's death, the only activity on the accounts was the interest paid by the bank.

3. At one point, Decedent lost the checkbook and had to close the account and re-open it under a new account number. At that time, approximately a month and a half before she

died, the account contained $67,800. At the time Karas closed the account two months later, the account contained $26,900. Beyond funeral costs and living expenses, Karas could not recall how the remaining money had been spent.

4. Among her "unusual behaviors," Dr. Yutzy cited the fact that Decedent lived without hot water for months, refused to leave her home for fear of it being robbed while she was gone, refused to change the furnishings or

Phyllis Gonzales and several of Decedent's friends from church and the neighborhood ("the friends") testified for Karas, stating that Decedent was a strong, smart woman, who did a lot of work for her church and kept good records. The friends maintained that even into the last six months of her life, Decedent remained extremely active as a leader in the Steam Club of St. Joseph's Church, an organization she had helped found to raise money to assist the church in heating the Shrine of St. Joseph, a noted landmark. The friends further testified that Decedent did not have any trouble making decisions and if she made up her mind to do something, she did it. Decedent's friends and neighbors denied that she had any tendency to procrastinate or had any problems with her Steam Club duties.[5]

In addition, the friends stated that Decedent had expressed gratitude towards Karas for his assistance and kindness to her and frustration with John and his brothers for not coming to visit her. These witnesses concluded that Decedent had granted Karas survivorship benefits because he was good to her, taking her places and cooking for her, and was the only person helping her. The friends described the assistance Karas provided as including gardening, housecleaning, cooking, washing, and shoveling snow for Decedent and her neighbors. Finally, the friends testified that Karas cared for Decedent as she became ill, initially spending the night occasionally in case she needed help or became severely ill and later regularly spending the night as her health declined.

Following closing arguments, the jury returned a verdict finding that Karas had exercised undue influence over Decedent and awarded the Duerbusches $580,822.55 in damages. Thereafter, the Duerbusches filed a Motion to Reopen Judgment to Grant Additional Relief, in which they asked the trial court to: (1) impose a constructive trust upon the proceeds of the property Karas obtained through undue influence; and (2) order Karas to return the proceeds in the amount of the judgment to the Duerbusches and Decedent's estate. The trial court amended the Judgment and imposed a constructive trust upon the proceeds of Decedent's property. Karas appeals.

### Standard of Review

A motion for Judgment Notwithstanding the Verdict ("JNOV") challenges the submissibility of a plaintiff's case. *Brown v. Bailey*, 210 S.W.3d 397, 404 (Mo. App. E.D.2006). "To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability." *Id.* In determining whether a plaintiff made a submissible case, a reviewing court views the evidence in the light most favorable to the jury verdict and affords the prevailing party the benefit of all reasonable inferences that may be drawn from the evidence. *Morgan v. Union Pac. R. Co.*, 979 S.W.2d 477, 480 (Mo.App. E.D. 1998). We will not disturb a jury's verdict when reasonable minds could disagree as to the questions before the jury and we will reverse "only when we find there is a

move the rugs in her home so that she could get out in an emergency, and that she allowed herself to be locked in the house from the inside when Karas left her home.

**5.** However, at least one of her fellow Steam Club members believed that Decedent had

some difficulty in keeping up with the accounts and seemed confused in the last six months of her life. Moreover, almost none of the friends saw Decedent during this time, because her attendance at Steam Club meetings decreased significantly.

complete absence of probative facts to support it." *Id.*

We review the admission or exclusion of expert evidence for manifest abuse of discretion. *Twin Chimneys Homeowners Ass'n v. J.E. Jones Const. Co.*, 168 S.W.3d 488, 504 (Mo.App. E.D. 2005). A "trial court abuses its discretion when the ruling is clearly against the logic of the circumstances or when it is arbitrary and unreasonable." *State v. Davis*, 32 S.W.3d 603, 608 (Mo.App. E.D.2000). Appellant bears the burden of rebutting the presumption that the trial court ruled correctly, proving that the trial court abused its discretion and showing that he or she has suffered prejudice from the abuse. *Twin Chimneys Homeowners Ass'n*, 168 S.W.3d at 504. "A trial court indeed has broad powers of discretion in determining whether a witness qualifies as an expert and the necessity for admission of expert testimony." *Rice v. Haltom*, 599 S.W.2d 248, 250 (Mo.App. E.D.1980).

### Analysis

#### A. Sufficiency of the Evidence

In his first point, Karas contends the trial court erred in denying his Motion for JNOV because: (1) the trial court applied the incorrect standard in determining whether to grant or deny the motion for JNOV, (2) the Duerbusches proffered insufficient evidence to create a presumption of undue influence, and (3) the Duerbusches otherwise failed to adduce sufficient evidence of undue influence.

When reviewing a motion for JNOV, the trial court analyzes whether the plaintiff made a submissible case. *Brown*, 210 S.W.3d at 404. More specifically, the trial court considers whether the plaintiff satisfied his or her burden of proof thereby justifying the submission of the case.

Karas contends that for the trial court to submit the case to the jury, the Duerbusches had to offer clear, cogent and convincing evidence of undue influence and accordingly when the trial court considered the JNOV, it likewise was required to apply a clear, cogent and convincing standard to assess the propriety of submissibility. In response, the Duerbusches argue that Karas waived this argument by failing to object to the burden of proof instruction during the instruction conference or tender an alternative burden of proof instruction setting forth the clear, cogent and convincing standard. Karas asserted his view that the trial court was required to assess submissibility using a clear, cogent and convincing evidence in his motions for directed verdict, JNOV, and new trial. Thus, to the extent that Karas is challenging the standard the trial court should have applied in assessing the motion for JNOV, we do not believe that he failed to preserve this issue.

In arguing that the trial court should have used a clear, cogent and convincing standard in determining the motion for JNOV, Karas primarily relies upon a case from the Western District, *Mace v. Loetel*, 166 S.W.3d 114 (Mo.App. W.D.2005). The *Mace* case involved a discovery of assets proceeding alleging that the defendant had wrongfully obtained money from the decedent prior to her death. *Id.* at 116. The court stated that the burden of proof in a discovery of assets proceeding was clear, cogent and convincing evidence. *Id.* at 117. However, the *Mace* court relied upon *In re Estate of Passman v. Graves*, 537 S.W.2d 380, 384 (Mo. banc 1976). The *Passman* case addressed the correct burden of proof instruction to provide a jury "as to the burden placed on a party claiming an inter vivos gift after the death of an alleged donor." *Id.* at 381. The case at hand does not involve a party claiming an inter vivos gift, which must be proven by

clear, cogent and convincing evidence. Thus, we are not persuaded that *Mace* should be followed here.

Karas also argues that the trial court erred in denying his JNOV motion because the record contained insufficient evidence to give rise to a presumption of undue influence. Undue influence occurs when a party in a position of trust induces the other, by "active conduct", to provide a substantial benefit through the transfer of property. *Estate of Gross*, 840 S.W.2d 253, 257 (Mo.App. E.D.1992). We have held that a "presumption of undue influence arises where substantial evidence shows: (1) a confidential and fiduciary relationship; (2) that the fiduciary obtained a benefit; and (3) some additional evidence from which there is an inference of undue influence." *In re Estate of Goldschmidt*, 215 S.W.3d 215, 221 (Mo.App. E.D.2006). "When a presumption of undue influence is supported by substantial evidence, a submissible case is made and the case should go to the jury even if there is contrary evidence." *Id.*

In determining whether sufficient evidence supports a presumption of undue influence, we apply a case-by-case analysis because the exercise of undue influence is often proved by circumstantial evidence. *Id.* "Persons exerting undue influence will do so in as subtle, furtive, indirect and elusive a manner as possible and such influence may therefore be shown indirectly by the reasonable and natural inferences drawn from the facts and circumstances proved." *Estate of Gross*, 840 S.W.2d at 257 (internal citations omitted). Thus, as we have held, it is often "impossible to set forth a rigid formula of what facts must be established to make a submissible case of undue influence by circumstantial evidence. Factual situations are subject to such a myriad of variations that any one case is of limited precedential value." *Id.*

To establish the first prong of the undue influence presumption, a plaintiff must show a confidential or fiduciary relationship. *Estate of Gross*, 840 S.W.2d at 257. A "confidential relationship exists when one thus relies upon and trusts another in regard to handling property and business affairs, thereby creating some fiduciary obligation." *Id.* The relationship exists regardless of whether their interactions are "technically fiduciary or merely informal[.]" *Id.* at 257–58. The evidence of the relationship need not be "overwhelming," but must merely show trust and reliance of one party by the other. *Id.*

Here, Karas not only assisted Decedent around the house and with her shopping and errands, but also actively helped her in almost every area of her life. She discussed everything with Karas before making any decisions and relied upon his advice. Karas referred her to his accountant, lawyer and doctor, all of whom assisted her in making medical, legal and financial decisions. Decedent told several of her friends how Karas provided her with investment advice. Moreover, she changed one of her checking accounts and her safe deposit box to list Karas as a joint owner. Decedent trusted and relied upon Karas for comfort, companionship and daily care. In addition, she gave him a power of attorney over her health and real estate decisions, both of which he actively used. At the end of her life, Karas and his family were the only people who saw her. Accordingly, the evidence was sufficient for the jury to find that Karas and Decedent had a confidential relationship.

To establish the second prong of the undue influence presumption, a plaintiff must show that the fiduciary obtained a benefit from his or her position of trust.

*Estate of Gross*, 840 S.W.2d at 257. Karas does not dispute that he received a benefit. The record establishes that Karas received $1,161,279 at Decedent's death. Although the evidence supports a finding that decedent intended Karas to receive some benefit there was sufficient evidence from which a jury could infer that the benefit would have been substantially lower.

■ Finally, to establish the third prong, a plaintiff must proffer some additional evidence from which undue influence may be inferred. *Goldschmidt*, 215 S.W.3d at 221. This includes the physical condition of the asset holder as well as "evidence that the fiduciary has the power to influence the holder of the assets, the opportunity to do so, and if the disposition of property was a changed course of action." *Id.* Missouri courts view the amount of evidence necessary to satisfy this prong liberally. *Id.* No one fact is determinative and our courts have found active procurement under numerous factual scenarios. *Id.* For example, in *In re Estate of Goldschmidt*, we found that the plaintiff had proffered sufficient evidence of active procurement when, prior to granting survivorship benefits, the decedent trusted the defendant with her financial documents, including bills, tax and insurance documents and a key to her safe-deposit box. *See Id.* Moreover, we found the fact that the decedent was blind and relied upon the defendant to drive her places, including the bank, relevant in assessing active procurement. *Id.* Here, similarly the record illustrates that Decedent was in ill-health and at times bedridden. Unable to drive, she relied upon Karas to drive her to various places, including the banks and the company in which she held stock.

Karas argues that, assuming *arguendo*, the record contained sufficient evidence to establish that he had the power and opportunity to influence Decedent, the record does not support a determination that Decedent's disposition of her property was a changed course of action because she did not have a will or other arrangement for her property upon her death.

The distinction drawn by Karas is unpersuasive. We have previously held that creating a POD account when the beneficiary would otherwise receive nothing is, in and of itself, a changed course of action. *Goldschmidt*, 215 S.W.3d at 222. Here, there is no question that prior to the change in the titling of the assets, Karas was not the beneficiary of. any of the accounts or investments. Thus, the new designations indicate a changed course of action on Decedent's part sufficient to establish "active procurement."

As in *Goldschmidt*, we determine that there is sufficient evidence in the record that: (1) Decedent and Karas had a confidential relationship; (2) Karas received a benefit; and (3) there is additional evidence which supports an inference of undue influence. Accordingly, the trial court did not err in refusing to grant the motion for JNOV. Point denied.

**B. Admissibility of Expert Testimony**

In his second point, Karas contends the trial court abused its discretion in admitting the testimony of Dr. Sean Yutzy because: (1) his opinion invaded the province of the jury; (2) his conclusion improperly bolstered the credibility of contested assertions provided solely by the Duerbusch family; and (3) his opinion was based upon psychological profiling.[6]

6. As an initial matter, the Duerbusches contend that Karas waived his point by failing to object when Dr. Yutzy testified. Prior to trial,

Karas objected to Dr. Yutzy's testimony by way of a Motion in Limine, which the trial court denied. Prior to Dr. Yutzy's testimony,

### 1. Province of the jury

■ Karas contends that the testimony of Dr. Yutzy invaded the province of the jury because it was not based on specialized knowledge but upon a commonplace inference of which the jury was equally capable.

■ Section 490.065.1 provides:
In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Thus, if a witness utilizes and applies "scientific, technical, or other specialized knowledge," the testimony is properly that of an expert. *Vittengl v. Fox,* 967 S.W.2d 269, 279 (Mo.App. W.D.1998). If, however, an expert testifies without applying specialized knowledge, he or she is "merely drawing an inference which the jurors are just as capable of drawing." *Id.* "In order to be able to offer his or her opinion, the expert's competence on the subject must be superior to that of the ordinary juror, and the opinion must aid the jury in deciding an issue in the case." *Id.*

■ It is well-settled that evidence of a decedent's physical and mental condition is admissible as proof of her *"susceptibility* to the persuasion of undue influence." *Salisbury v. Gardner,* 515 S.W.2d 881, 886 (Mo.App.1974) (emphasis in original). Dr.

Yutzy's testimony that Decedent was susceptible to undue influence was based upon Dr. Yutzy's medical and forensic knowledge and his review of matters related to Decedent, including her age, education, physical condition and mental condition during the relevant time period. Dr. Yutzy discussed risk factors for undue influence and related those factors specifically to Decedent. These are not matters of such common knowledge as to invade the province of the jury. Accordingly, the trial court did not abuse its discretion in admitting Dr. Yutzy's testimony.

### 2. Improper bolstering

■ Karas argues that the trial court abused its discretion in admitting Dr. Yutzy's testimony because his testimony was primarily an extended commentary endorsing the credibility of the Duerbusches evidence and was inadmissible because it improperly bolstered the credibility of their witnesses.

■ Generally, expert testimony that relates to the credibility of a witness is inadmissible. *State v. Tyra,* 153 S.W.3d 341, 348 (Mo.App. S.D.2005). This is because the testimony of an expert that "comments directly on a particular witness' credibility ... invests scientific cachet on the central issue of credibility...." *Id.* (internal citations omitted). Here, however, Dr. Yutzy did not comment upon the credibility of any witnesses. Rather, he relied upon all of the documents produced by both parties during discovery

Karas reminded the trial court of his Motion in Limine and moved that Dr. Yutzy not be allowed to testify. Karas again raised the issue in his Motion for New Trial. The basis for Karas' objection at trial was that: (1) "the facts upon which Dr. Yutzy relies [were] not the sort that [were] beyond the capacity of laymen to understand and evaluate based upon their common knowledge and experience"; and (2) Dr. Yutzy's testimony amount-

ed to psychological profiling. A review of the record establishes that Decedent did not object to Dr. Yutzy's testimony on the grounds that it invaded the province of the jury. However, because the substance of the objection at trial ("common knowledge" and "psychological profiling") and the substance of his appellate point are nearly identical we will consider this point.

and based his conclusion, in part, upon several of the Duerbusches contested assertions and observations regarding Decedent. Reliance upon contested assertions is not necessarily an improper comment upon the credibility of a witness. *See Peterson v. Nat'l Carriers, Inc.*, 972 S.W.2d 349, 357 (Mo.App. W.D.1998) ("An expert does not improperly comment on credibility simply because his or her testimony, if accepted, may cause the jury to conclude that a witness is not credible."). Moreover, counsel for Karas had an ample opportunity to cross-examine Dr. Yutzy regarding the basis for his conclusion and inform the jury, as he did, during closing argument that Dr. Yutzy's opinion rested upon contested assertions. Accordingly, the trial court did not err in admitting Dr. Yutzy's testimony.

### 3. Psychological profiling

 Karas asserts the trial court erred in admitting Dr. Yutzy's testimony because it amounted to "psychological profiling," which, he contends, is heavily disfavored by our courts. Specifically, Karas argues that Dr. Yutzy took "certain features of [Decedent's] background, age, sex, partial dependency, and conclude[d] that these factors place[d] her in a category of persons who have a propensity to be susceptible to undue influence." Karas maintains that, "profiling as to the foibles of the elderly should enjoy no greater acceptance than sex offender profiling or racial profiling."

In contending that Dr. Yutzy's application of forensic psychiatry amounted to profiling, Karas relies upon *Vittengl v. Fox*, 967 S.W.2d 269, 279–82 (Mo.App. W.D.1998). In *Vittengl*, the resident of an apartment building sued the owner for negligence, alleging that the failure to properly light the premises permitted an unknown assailant to attack her. *Id.* at 273. A trial court allowed an expert to testify "based upon his beliefs about the unknown assailant, whether changes to the premises would have protected plaintiff from this occurrence." *Id.* at 279. On appeal, the apartment building owners contended that the trial court erred in allowing the expert to testify about the characteristics of the "unknown assailant" as the testimony amounted to nothing more than psychological profiling. *Id.* The *Vittengl* court reversed the trial court's decision, finding that the expert's testimony was inadmissible because it "involved no specialized knowledge and yet was presented as evidence rather than as speculation." *Id.* at 282.

*Vittengl* is inapposite. Here, unlike *Vittengl*, Dr. Yutzy's testimony regarding Decedent's susceptibility to undue influence went to a fact directly at issue in the case and evidence of her mental condition was highly relevant to proving that fact. As opposed to the expert's testimony in *Vittengl*, Dr. Yutzy applied specialized knowledge and generally accepted techniques to reach an opinion to a degree of medical certainty. Finally, unlike *Vittengl*, Dr. Yutzy did not create a generalized picture of an average person at risk of undue influence and apply the picture to Decedent. Instead, Dr. Yutzy testified solely regarding his understanding of Decedent's documented physical and mental condition and analyzed whether her particularized condition affected her ability to act on her own and in the face of Karas' alleged influence. Point denied.

### B. Amended Judgment

 In his third point, Karas contends the trial court erred in entering an amended judgment more than thirty (30) days after the entry of the final judgment because the amended judgment was premised on a basis other than one contained in

his motion for new trial, and therefore, the trial court lacked jurisdiction.

Rule 75.01 provides that the trial court retains jurisdiction for the thirty-day period after the entry of judgment and "may, after giving the parties an opportunity to be heard and for good cause, vacate, reopen, correct, amend, or modify its judgment within that time." However, the trial court retains jurisdiction for up to ninety days if a party files an authorized after-trial motion, such as a motion for new trial. Rule 81.05(a)(2); *Taylor v. United Parcel Service, Inc.*, 854 S.W.2d 390, 391 (Mo. banc 1993).

Here, the trial court entered the judgment on August 2, 2006. On August 23, 2006, Karas filed a motion for new trial. On September 1, 2006, the Duerbusches also filed a motion to reopen judgment to grant additional relief, asking the trial court to amend the judgment. On October 12, 2006, the trial court entered an order denying Karas' motion for new trial and granting the Duerbusches' motion, entering an amended judgment imposing a constructive trust over the proceeds of the accounts and investments owned by Decedent at the time of her death.

Karas seems to contend that the motion to reopen was not an authorized after-trial motion. Even if it is not, the motion for new trial filed by Karas is certainly an authorized after-trial motion. *Id.* Therefore, the trial court's jurisdiction over the judgment was extended for ninety additional days "from the date the last timely motion was filed." Rule 81.05(a)(2). Because the amended judgment was entered within ninety days from the date the last timely authorized after-trial motion was filed, the trial court had jurisdiction to amend the judgment. Whether or not the trial court *properly* amended the judgment is a different question than whether the court had *jurisdiction* to do so. Karas'

point only challenges whether the trial court had jurisdiction to amend the judgment. Point denied.

### Conclusion

The judgment of the trial court is affirmed.

KATHIANNE KNAUP CRANE and NANNETTE A. BAKER, JJ., concur.