Mark **NESTEL, et al., Respondents,**

v.

Melissa **ROHACH, Appellant.**

**WD 79867**

Missouri Court of Appeals, Western District.

Opinion filed: June 27, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied August 1, 2017

Application for Transfer to Supreme Court Denied October 31, 2017

---

Kimberly J. Westhusing-Kass, for Respondents.

Adam S. Davis, Kansas City, for Appellant.

Before Division Three: Anthony Rex Gabbert, Presiding Judge, Victor C. Howard, Judge and Cynthia L. Martin, Judge

## VICTOR C. HOWARD, JUDGE

Melissa Rohach appeals the judgment of the Jackson County Circuit Court in a discovery of assets action alleging undue influence related to beneficiary designations on seven accounts. The jury found no undue influence on four of the disputed accounts and undue influence on three other accounts. In her first point on appeal, Melissa Rohach complains the trial court erred in denying her motions for directed verdict and judgment notwithstanding the verdict because the evidence does not support a finding of undue influence. In her second point on appeal, Melissa Rohach claims the trial court erred in denying her alternative motion for new trial because the jury verdict was inconsistent. Given the disposition of the first point on appeal, Melissa Rohach's second point is not addressed. The judgment is reversed.

### Facts

Robert and Joanne Nestel were married for almost 51 years. They had four children: Mary Nestel, Mark Nestel, Michelle Helzer, and Melissa Rohach. Robert operated a State Farm office. His daughter Mary worked for him for 27 years. Robert died on December 20, 2013. His funeral was on December 28, 2013.

On January 6, 2014, Joanne learned that Robert's will left his estate to the four children. She also learned that he left his business to the four children. Joanne was previously unaware that she would not receive assets through Robert's will or business.[1]

On January 23, 2014, Joanne executed a will setting forth her testamentary intent. In that will, she nominated her daughter Melissa as personal representative of her estate. She nominated Melissa's husband Chris Rohach (Joanne's son-in-law) as first successor personal representative. Joanne left 20% of her estate to each of her four children and 5% of her estate to each of her four grandchildren, for a total of 100%.

On March 24, 2014, Joanne modified her will. She left her house and all of its contents (unless excluded later in the amendment) to Melissa. The amendment stated: "In the case that my daughter Melissa A. Rohach precedes me in death, then her children, Collin P. Rohach and Carrigan H. Rohach[2] will get her share of my estate that I have noted in my Will and the amendment to my original Will." The following property was excluded in the amendment:

Michelle Nestel-Helzer—All the Belleek Christmas Ornaments and wedding picture

Mary Nestel—one oriental bowl

Mark Nestel—the musical clowns

Mary Ann Nestel the cross from Robert's funeral

On July 1, 2014, Joanne changed her will again. She identified a loan to which she was the mortgage holder. She left the incoming loan payments to her four grandchildren. The document stated: "I would like Colin Rohach to be in charge of making sure all four grandchildren get an equal monthly share of what is left on the loan. Colin is in charge of making all decisions on the home loan."

Starting in January 2014, Joanne made a series of non-probate transfers to Melissa. With these transfers, Joanne made Melissa the beneficiary of various accounts. These accounts were not part of Joanne's estate and were not governed by the will dividing the estate between Joanne's children and grandchildren. The following chart shows the account locations, date of transfer to Melissa, and account balance:

| | Account | Date of Designation to Melissa | Balance |
|---|---|---|---|
| 1 | Commerce Bank | 01/02/2014 & 01/09/2015 | $17,939.28 |
| 2 | National Bank of Kansas City | 01/09/2015 | $6,232.81 |
| 3 | United Missouri Bank | 01/09/2015 | $4,800.73 |
| 4 | State Farm #2612 | 01/22/2014 | $6,454.05 |
| 5 | State Farm #3454 | 01/23/2014 | $50,878 |
| 6 | Computershare IBM Stock | 03/28/2014 | $96,000[3] |
| 7 | Waddell & Reed IRA | 06/11/2014 | $476,735.40 |

These accounts were the bulk of Joanne's assets.

Joanne died on September 7, 2014. On January 21, 2015, Melissa's siblings filed a petition to remove her as personal representative of her mother's estate and for discovery of assets. In May 2015, the circuit court appointed Brian Tillema as Administrator Ad Litem for the purpose of litigating the discovery of assets claim on behalf of the Estate of Joan Nestel. An

1. Joanne eventually filed a will contest that was dismissed after her death.

2. Colin and Carrigan are the children of Melissa and Chris Rohach and are two of Joanne's four grandchildren.

3. $96,000 was the value of the stock on 12/17/2014.

amended petition to remove Melissa as personal representative and for discovery of assets, brought on behalf of the estate and the siblings,[4] was filed on October 14, 2015.

The matter proceeded to a jury trial in March 2016. After four days of trial, the jury returned a verdict that found no undue influence by Melissa as to accounts 1, 2, 3, and 4 in the above chart. The jury found that there was undue influence as to accounts 5, 6, and 7 in the above chart.

This appeal by Melissa followed.

## Standard of Review

■ "We treat an appeal from a trial court's denial of motions for directed verdict and judgment notwithstanding the verdict in the same manner; our primary inquiry is whether the plaintiff made a submissible case." *Ruestman v. Ruestman*, 111 S.W.3d 464, 478 (Mo. App. S.D. 2003). "In order for a case to be submitted to the jury, each and every fact essential to liability must be predicated upon legal and substantial evidence." *Id.* "In determining whether the plaintiff made a submissible case, the appellate court views the evidence in the light most favorable to the jury's verdict and gives the plaintiff the benefit of all reasonable inferences and disregards evidence and inferences conflicting with the verdict." *Id.* "Our courts will not supply missing evidence or give a party the benefit of unreasonable speculative or forced inferences." *Id.* (internal quotation omitted). "This court may reverse the trial court's ruling only when there is a complete absence of probative facts to support the verdict." *Id.* "We will not disturb a jury's verdict when reasonable minds could disagree as to the questions before the jury and we will reverse only when we find there is a complete

absence of probative facts to support it." *Duerbusch v. Karas*, 267 S.W.3d 700, 706-07 (Mo. App. E.D. 2008) (internal quotation omitted).

## Analysis

■ In her first point on appeal, Melissa claims the trial court erred in denying her motion for directed verdict and judgment notwithstanding the verdict. She says there was no substantial evidence to support the jury's finding of undue influence by Melissa on the three accounts. Melissa argues that the evidence does not support a reasonable inference that any actions by Melissa overcame the free will of Joanne.

■ "Undue influence occurs when a party in a position of trust induces the other, by 'active conduct', to provide a substantial benefit through the transfer of property." *Id.* at 708 (internal citation omitted). "In determining whether sufficient evidence supports a presumption of undue influence, we apply a case-by-case analysis because the exercise of undue influence is often proved by circumstantial evidence." *Id.* "Persons exerting undue influence will do so in as subtle, furtive, indirect and elusive a manner as possible and such influence may therefore be shown indirectly by the reasonable and natural inferences drawn from the facts and circumstances proved." *Id.* (internal quotation omitted). "Thus, as we have held, it is often impossible to set forth a rigid formula of what facts must be established to make a submissible case of undue influence by circumstantial evidence." *Id.* (internal quotation omitted). "Factual situations are subject to such a myriad of variations that any one case is of limited prec-

4. Though the Respondents in this case are Melissa's siblings and the Administrator Ad Litem, they will be referred to collectively as Melissa's siblings in this opinion.

edential value." *Id.* (internal quotation omitted).

█ "Undue influence itself is usually defined as such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another." *In re Estate of Hock*, 322 S.W.3d 574, 579 (Mo. App. S.D. 2010) (internal quotation omitted). "Also, in determining whether there is evidence of undue influence, the court does not have to find the testator or grantor to be of unsound mind, ... therefore, one may be unduly influenced while still mentally competent." *Id.* (internal quotation omitted).

█ "A presumption of undue influence arises in discovery of assets cases where substantial evidence shows (1) a confidential and fiduciary relationship; (2) benefaction to the fiduciary; and (3) some additional evidence from which undue influence may be inferred." *Id.* at 579 (internal quotation omitted). "Once established, the presumption makes a prima facie case of undue influence, effectively shifting the burden to the fiduciary to rebut." *Id.* The Administrator Ad Litem and Melissa's siblings agree in their brief that "a confidential relationship was not proven and therefore the three-element presumption does not apply."

Melissa's point is focused on an alleged lack of evidence that she overcame her mother's free will. She claims that none of the evidence gives rise to a reasonable inference that Melissa exerted undue influence and overcame Joanne's free will. Considering the evidence in the light most favorable to the jury's verdict, this court finds that Melissa's siblings did not present a submissible case.

Though Joanne was deceased and unable to testify at trial, her journals and other writings were admitted into evidence. These journals demonstrated that Joanne had special affection for her daughter Melissa and had felt that way for many years. They also showed that Joanne and Robert had a turbulent relationship. In an entry from Joanne's journal dated February 10, 2009, she wrote:

> I am loved by so many others outside my family. But I have to thank Melissa for caring about me the most and loving me with all her heart and soul. My baby. She is there when no one else is. And I know the others care, but they didn't do anything about it like she does. They wonder why I show more love to her. This is why. Because she is always there and I need that so much as Robert isn't there for me.

In a handwritten note from approximately 2011, Joanne wrote:

> Dear Melissa, Chris, Colin, and Carrigan,
>
> Thank you is not enough to say for all you do for me. Take me to the doctors. Buy my groceries. Cooking meals. Cleaning my house. I could go on and on. ... I pray for you and your help, Melissa. I love you so much. I wish I was rich so I could really help you and Chris. But that's life.

Joanne also kept a blood pressure chart where she wrote her blood pressure and pulse. She often journaled on the back of those pages. On the page dated March 25 through 31, 2010, Joanne wrote:

> My son called. Did not apologize to me. Said not come over anymore. Wasn't that nice. His mother.

On the page dated April 9 through 16, 2010, Joanne wrote:

> Michelle mad at me. Said I said Jeff[5]

---

5. Jeff is Michelle's husband.

did not take good care of Bo.[6] I never said that. I said, quote, I never stressed my children to take special care of their teeth. When Melissa and Chris had children, Chris did make sure that kids' teeth had special care. All I mentioned was the name Chris and Michelle blew her stack. Did not hear a word I said. Now Jeff is mad at me. So I have not seen Bo or Katie[7] since Easter Sunday. 4-4-10. It's now 4-16-10. I mailed him a gift. And Michelle says it's from the Easter bunny, not grandma. Lie.

On the page from April 17 through 24, 2010, she wrote:

> Mark, Vicki,[8] Michelle, Jeff are mad at me. I'm put out by them. They show no respect. Jealous over Chris and Melissa. But they go out of their way to be respectful to their in-laws. If they never apologize to me, so be it. I'll stay away. This too shall pass. Lies. Said I said bad things about Jeff. I didn't even mention his name. Like Jesus said to Pilate. You say this. 4-23-10. Friday. 10:00 a.m. Mark said he will never come over to the house.

On the page dated May 1 through 8, 2010, Joanne wrote:

> Why does my husband have others treat me with hate? Why do Mark and Michelle hate me? Because I run to Melissa. Who takes care of me when I need help? I hurt so bad. My neck. My back. I have no way to get to the doctor's unless I call Melissa. My neck, on the right, the muscle is inflamed. I haven't seen Bo or Katie since April 24th. That was far be at church. May Bob, Michelle, Mark, Vicki and Jeff pay all because I am nice to Chris and Melissa who help me. What will Sunday bring? Happiness or hell.

On January 21 through 31, 2014, Joanne wrote:

> Mary received money. 11,000. But will not give it to me.

On February 11 through 20, 2014, Joanne wrote:

> Mary still has my money. State Farm. Money to pay my bills: Zero. To live on: Zero. Thanks. You're the wife, Joanne.

On March 11 through 20, 2014, Joanne wrote:

> Mary, Mark, and Michelle say they love me. But we haven't gotten together before Robert died. The only one who cares and loves and cares if I live or die is Melissa. All the others want is $ $ $ of Robert's. $11,000. My estate. I was supposed to receive $11,000 monthly. The only one gotten—the only thing gotten is bills, bills, and more bills. I have received zero. Good thing I put a little aside for a rainy day. Well, rainy day is here for me. If that's love, I don't need it. Now, they are after the rental house. Sold. I'm very caring and they want it. No. But January: Zero. February: Zero. March will be zero. Only one getting money is my lawyer. And so far doing nothing. And money ... Thanks, Bob.

Melissa's siblings did not present any evidence from Joanne's journals and writings contradicting the assertion that Joanne had a special affection for Melissa.

The evidence was also uncontradicted that this family was in turmoil following Robert's death. Joanne was upset at being left out of Robert's will and Robert's business. Joanne filed a will contest action. Joanne and all four of her children ended up retaining counsel. They tried to come to some sort of settlement agreement but were unable to because Melissa's siblings

---

6. Bo is Michelle's son.

7. Katie is Michelle's daughter.

8. Vicki is Mark's wife.

would not give Joanne certain payments she requested in the manner Joanne requested. Mary was the personal representative of Robert's estate and her role as such led to conflict between Joanne and Mary.

Melissa's siblings argue that twelve factors support a finding of undue influence. They acknowledge that these factors are pulled from various sources and are not a test set forth in case law or statute. Melissa says that her siblings are trying to hide the lack of quality evidence pertaining to overcoming Joanne's free will with a large quantity of evidence that does not really address the issue of undue influence.

First, Melissa's siblings say that the designation of Melissa as beneficiary departed from Joanne's testamentary plan. Joanne executed a will on January 23, 2014, dividing her estate between her children and, to a lesser extent, her four grandchildren. Melissa's siblings claimed that seven accounts had the beneficiary designation changed because of undue influence. Four of those accounts were changed prior to January 23, 2014. The other three, which are the three the jury found had been changed because of undue influence, had the beneficiary designations changed on January 23, 2014 (the record does not reflect the time, so it could have been before the execution of the will), on March 28, 2014, and on June 11, 2014.

The evidence does not support a finding that the beneficiary designations departed from Joanne's testamentary plan. Joanne had already changed the beneficiary designation on four (and possibly five) of the accounts prior to executing her will. Joanne's attorney testified that he saw no evidence of Melissa coercing or unduly influencing Joanne with regard to these transactions.

The attorney said that he explained ways of transferring property outside of probate and that he represented Joanne when she executed the will dated January 23, 2014. The attorney testified that Joanne was concerned about a challenge to the will if she left everything to Melissa. No evidence was presented that Joanne was unable to understand ways to transfer property both within and outside of probate. To the contrary, Robert had left Mary a life insurance policy that passed to her outside of probate. Joanne knew that a parent could pass property to a child outside of a will.

Moreover, Joanne amended her will to leave most of her property to Melissa on March 24, 2014. Thus, the beneficiary designations were in line with her testamentary intent. The siblings place some emphasis on the fact that the will was changed without the presence of witnesses and a notary. They do not challenge the validity of the will, though.

The siblings also argue that there was no evidence that Joanne had conflict with or would want to disinherit her grandchildren. They use this to show that the beneficiary designations go against her testamentary intent. In her January 23 will, Joanne left each of her four grandchildren 5% of her estate. On July 1, 2014, Joanne changed her will again. She identified a loan to which she was the mortgage holder. She left the incoming loan payments to her four grandchildren. She did not disinherit her grandchildren.

Second, Melissa's siblings say Melissa made multiple attempts to seclude and control Joanne. Melissa's siblings claim that evidence showed Melissa discouraged visits by others. They argue that Melissa's discouragement of visits by others is what is significant. In their brief, Melissa's siblings state that there does not have to be actual seclusion—just an attempt.

Melissa's siblings blamed her for their inability to see their mother, but there is not substantial evidence that Melissa actually stopped them from seeing Joanne. Mark and Mary testified that there were confrontations any time they saw Melissa. They did not get to see Joanne because Melissa was always at Joanne's house and they did not want to go inside and have a confrontation. They would drive by Joanne's house and, if Melissa's car was in the driveway, they would not stop to see Joanne. Melissa did not try to stop them from seeing Joanne—she just made it miserable when they did so.

Mark testified that he pulled away from all the family drama at the suggestion of his priest. He testified he did this because of his priest's advice, not because Melissa made him stay away. In a letter he gave his mother in April 2014, Mark wrote: " . . . it breaks my heart daily that you feel this way. But you leave us no choice but to respect your decision to disown your three children and shutting us out of your life."

Mary continued to talk with her mother until July 2014. Mary testified that she would go to her mother's house when Melissa was not there and that her mother let her in the house about half the time. Joanne did not let Mary in the other half of the time, even though Melissa was not present. In other words, sometimes Joanne did not want to be around Mary, even if Melissa was not present. Mary also testified that Joanne's lawyer, not Melissa, asked Joanne not to talk to Mary because of the ongoing litigation between the family members.

The evidence that Melissa actively tried to seclude Joanne was limited. Mary and Mark testified that the family went to a grandchild's first communion. Mary called and offered to give Joanne a ride, but Joanne said she already had one. Joanne went with Melissa and they left as soon as the first communion was over. Melissa's siblings felt as though Melissa tried to whisk Joanne away before anyone could talk to her.

A long time neighbor and friend of Joanne testified that Melissa told her that she didn't want the neighbor to speak to Joanne anymore—that there would be no further conversations between Joanne and the neighbor. The neighbor said she tried to call Joanne after that but never received any return calls. The neighbor said she took that as an attempt by Melissa to seclude Joanne from the neighbor.

Joanne's hair stylist testified that Melissa called her and said that Melissa didn't think it was going to be okay for Joanne to keep going to the hair salon because of the stylist's friendship with Mary. Despite this, Joanne continued to see the hairstylist until the week before her death.

Third, Melissa's siblings say that Melissa actively participated in the procuring of beneficiary designations, wrote checks out of Joanne's account, actively participated in Joanne's legal affairs, and shared the same attorney as Joanne. The evidence was undisputed that Joanne's driver's license expired on October 6, 2009. She did not renew it because of her health struggles with breast cancer and cataract surgery. Melissa drove Joanne to most places from 2009 until her death in 2014.

Melissa drove Joanne to the appropriate locations to make the seven beneficiary designations. She testified that she did so because her mother asked her to and because she drove her mother most places. There was no evidence contradicting Melissa's testimony that she drove Joanne most places.

Melissa helped her mother fill in certain information on one of the financial forms changing the beneficiary designations. Melissa said she did this because the form

had little boxes. Melissa routinely filled out documents for her mother, including checks. The evidence at trial was the Melissa filled out checks for utilities, life insurance, and health insurance for Joanne to sign. There was no evidence that Melissa filled out checks for Joanne to sign for Melissa's personal gain.

One of the accounts at issue was State Farm #7047. The State Farm employee who made the beneficiary designation testified. She said that Joanne did not want any money to go to Mary. The State Farm employee testified that she did not see any sign that Joanne was confused or scared. When asked about Melissa driving Joanne to the office, the employee said: "I believe it was on Joanne's request that Melissa brought her because Joanne needed to take care of that." This occurred on January 22, 2014.

Joanne and Melissa had the same attorney representing them in the conflict with Melissa's siblings over Robert's estate. The attorney represented Joanne first. When asked by opposing counsel, the attorney said there was not a conflict in representing both Joanne and Melissa because they were in alignment.

Fourth, Melissa's siblings say Melissa kept secret and concealed from her family and husband the fact that Joanne designated Melissa the beneficiary of the bank accounts. Melissa said she did not tell her siblings because she did not speak to them. The evidence was undisputed at trial that Melissa did not get along with her siblings. It is not surprising that she did not keep them informed about the beneficiary designations.

Melissa said she did not tell her husband because that was her mother's personal information and if her mother wanted him to know, she could tell him. It was undisputed at trial that Joanne received an allowance from Robert twice per month dur-

ing the entirety of their marriage. They did not use joint accounts for day to day expenses. Similarly, Melissa and her husband have maintained separate bank accounts during their marriage.

Fifth, Melissa's siblings say that Melissa actively participated in Joanne's legal affairs and even shared the same attorney despite opposing counsel's expressed concern that there might be a conflict of interest. This was addressed with their third factor.

In the sixth, seventh, and eighth factors, Melissa's siblings say Melissa had ample opportunity and time to unduly influence Joanne and that Melissa exhibited hostile feelings toward her siblings who were the expected recipients of Joanne's inheritance. Melissa's siblings also say Melissa made derogatory remarks to her siblings. As stated, the evidence at trial was that Melissa and her siblings did not get along with one another and that Melissa had historically been the child to spend the most time with Joanne. There was not evidence that Joanne had ever intended to treat all children equally. The best evidence would be the January 23 will, but this was executed after Joanne's attorney explained to her how to transfer assets outside of probate.

Ninth, Melissa's siblings say there were suspicious circumstances around the date of Joanne's designating Melissa as the beneficiary of the accounts demonstrating that Joanne did not know or was confused about the extent of her money. Joanne made statements to several people that she was worried and upset after being left out of Robert's will and business. She was afraid that she would not have enough money to live on. She told her hair stylist that she might not be able to afford to get her hair done anymore.

The siblings argue that this is evidence that Melissa misled Joanne about the status of her accounts in an effort to exert undue influence. They presented no evidence of anything Melissa said or did that would lead to Joanne's confusion. Moreover, Joanne was represented by an attorney who understood her accounts.

Joanne was concerned that she no longer received the twice monthly allowance she had received during her marriage. The evidence was undisputed that she was upset with Mary as the personal representative of Robert's estate because Mary would not make payments Joanne felt entitled to. Michelle testified that her mother said she had roughly $95,000 to live on for the rest of her life. Joanne told a friend that she had no money.

No evidence was presented about why Joanne thought she did not have enough money. No evidence was presented that this misperception resulted from anything Melissa said or did. Moreover, there a logical reason why Joanne might have been concerned about monthly cashflow despite having the disputed accounts. The largest disputed account was an IRA. The second largest account was IBM stock which Joanne told Melissa should never be sold. The third largest account was a life insurance policy which did not pay out until Joanne's death.

Tenth, Melissa's siblings say that Melissa worked at the State Farm office where some of the assets were located and gained knowledge on how to transfer the assets to herself via beneficiary designations. Melissa worked for several years at her father's company. She is not the one who made the changes to the beneficiary designations, though. Further, when asked about the years that Melissa worked with her, Mary testified: "Melissa wasn't licensed. So there wasn't a whole lot she could do ex-cept answer the phone and take messages."

One of the State Farm agents who made the changes testified that Joanne wanted the changes made. She said that Joanne did not want any money to go to Mary. The State Farm employee testified that she did not see any sign that Joanne was confused or scared.

Eleventh, Melissa's siblings say Joanne was grieving the recent death of her husband, and she was susceptible to undue influence. While Joanne was likely grieving, the evidence was undisputed that Robert and Joanne had a difficult marriage. Robert lived with Mary from 2011 until his death in 2013. He did so because of health issues and his inability to navigate the stairs in his and Joanne's home. Joanne remained in the family home alone.

It was undisputed that Joanne was angry about how Robert chose to leave his estate and business. There was no evidence that anyone had successfully exerted influence on Joanne in any situation. At least five witnesses testified that Joanne was a strong independent woman. Joanne's attorney testified that Joanne "was very strong-willed, certain, knew what she was doing" and "I think you have a very hard time persuading Joanne Nestel from what she wanted to do."

Twelfth, Melissa's siblings say the transfer to Melissa over the other three siblings of the majority of Joanne's estate was an unnatural property disposition. In the ensuing family conflict after Robert's death, the evidence was uncontradicted that it basically became Melissa and Joanne against Mary, Mark, and Michelle. Joanne's attorney testified that Joanne was not getting payments from Robert's estate that Joanne felt entitled to. Joanne blamed Mary, the personal administrator of Robert's estate.

Joanne's attorney testified via deposition that Joanne definitely distrusted Mary and that she had concerns that Mark, Mary, and Michelle "were kind of working together and she didn't really know whether or not she could trust all of them; all three of them together." Robert Rhodes, a friend of the family, testified that Joanne was afraid she was going to need to hire an attorney "to protect herself from the kids." He clarified that he thought Joanne was referring to Mary, Mark, and Michelle and not Melissa.

Melissa's siblings go to great lengths in arguing that they made a submissible case. They fail, however, to identify substantial evidence that Melissa overcame Joanne's free will. Even before Robert's death, Melissa was closer to her mother than the other three siblings. Melissa drove her mother places and filled out documents for Joanne. Robert's death and disposition of his estate threw the family into a state of turmoil. Joanne and all four children retained counsel. Mark sought the advice of a priest because of the conflict. Joanne was angry with Mary because Mary, as personal representative of Robert's estate, did not give Joanne funds she felt entitled to. Mary tried to reach a legal settlement with Joanne. An attorney hired by Mary even drew up the settlement contract, but Joanne refused to sign it. It was undisputed that Joanne refused to sign because of disagreements over how much money she should receive and whether she could leave that money to Melissa.

■■■ Joanne knew how to leave assets to someone outside of probate. When Joanne died, her will (which was not legally challenged) left most of her personal property, including her house and its contents, to Melissa. "Motive and opportunity alone are not enough to establish undue influence." *Ruestman*, 111 S.W.3d at 479. Joanne was allowed to get angry at her children. She was allowed to leave all of her assets to just one child or to none of her children. She was not required to leave them to all four children equally. Considering the evidence in the light most favorable to the jury's verdict, Melissa's siblings did not present a submissible case that Melissa overcame Joanne's free will.

■■■ Other cases involving undue influence are generally "not helpful because each case must be decided upon its own facts and it is seldom that we find cases involving strongly similar facts." *Wilhoit v. Fite*, 341 S.W.2d 806 (Mo. 1960). "Factual situations are subject to such a myriad of variations that any one case is of limited precedential value." *Matthews v. Turner*, 581 S.W.2d 466, 472 (Mo. App. S.D. 1979). "A circumstantial case of undue influence is not made by the establishment of any one factor." *Id.* at 473. "Rather it is a combination of factors." *Id.* "As a result, it is seldom, if ever, that a case can be found which is 'on all fours' with the case at bar." *Id.*

With this limitation in mind, *Ruestman*, 111 S.W.3d 464, is still helpful in the present case. In *Ruestman*, a son brought a discovery of assets and will contest action against his father's second wife. 111 S.W.3d at 469. The son won at trial. *Id.* The second wife appealed, claiming the son failed to make a submissible case of undue influence. *Id.* at 478. The second wife was a not a fiduciary so the presumption of undue influence did not apply. *Id.* at 480.

In reviewing the evidence in the light most favorable to the judgment, the court looked at all the evidence to add context to the circumstantial evidence and to determine what inferences were reasonable. The court noted that the father had times when he was not lucid and when he was confused. *Id.* A doctor testified that the father's mental faculties were sometimes impaired. *Id.* There was no evidence, how-

ever, that the father was not aware of what he was doing at the time he executed his will. *Id.* The Southern District stated: "As noted, although there was some evidence presented at trial indicating [father] experienced episodes of confusion, the majority of the witnesses testified that [father] was 'strong-willed' and made his own decisions." *Id.* at 481.

The court noted that father and second wife were married and had a relationship before father executed his will. "[The second wife's] relationship with [father] was established long before the short time period which would support an inference of undue influence." *Id.* at 482. "[T]he law does not ban as undue the natural influence of affection or attachment or the desire to gratify the wishes of one beloved or trusted by the [testator]." *Id.* (internal quotation omitted). The court stated: "While there was evidence that [father's] will was a change in his predetermined testamentary intent, which was formulated when he was married to [his first wife], there was nothing to indicate this change was due to [second wife's] undue influence." *Id.* at 483. "A wife may properly influence her husband to make a will for her benefit so long as her influence is not exercised in an improper manner or by improper means and her influence does not cause the substitution of the will of the wife for the will of the husband." *Id.*

The court found that "[son's] evidence only showed that [second wife] may have had the power and opportunity to unduly influence [father] by virtue of her marriage to him and 'what goes on behind closed doors.'" *Id.* at 486. "[Son] did not present any evidence indicating [second wife] seized the opportunity to influence [father] or that she engaged in active conduct to procure the will." *Id.* (citing *Morse v. Volz*, 808 S.W.2d 424 (Mo. App. W.D. 1991)). "The evidence presented at trial by [son] combined with the evidence presented by [second wife] that favors [son], did not as a whole sustain the submission of undue influence to the jury in the will contest." *Id.* "There was no substantial evidence to support an inference that the will executed by [father] was the result of [second wife's] undue influence." *Id.*

The same is true in the current case. Melissa's siblings failed to present substantial evidence that the beneficiary designations resulted from Melissa overcoming Joanne's free will. The point is granted.

### Conclusion

The judgment is reversed.

All concur.