

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| JERRY L. WILSON, | ) | |
| | ) | |
| Appellant-Respondent, | ) | **WD83111** |
| v. | ) | **(Consolidated with WD83137)** |
| | ) | |
| | ) | **OPINION FILED:** |
| WILDA L. TRUSLEY, | ) | **May 4, 2021** |
| | ) | |
| Respondent-Appellant. | ) | |

**Appeal from the Circuit Court of Miller County, Missouri**
**The Honorable Jon A. Kaltenbronn, Judge**

**Before Division Two:** Mark D. Pfeiffer, Presiding Judge, and
Alok Ahuja and Karen King Mitchell, Judges

This case centers on late-in-life changes Mona E. Wilson made to how property, both real

and personal, would be divided upon her death between her son Jerry Wilson and her daughter

Wilda Trusley.[1] Jerry contends that he and Mona formed a business partnership in 1986 or 1987

and certain partnership assets, including 158 acres of farmland and jointly held bank accounts and

certificates of deposits (CDs), passed to Jerry as the surviving partner upon Mona's death. But,

before her death in 2017, Mona deeded the 158 acres to Wilda and gifted the jointly held bank

---

[1] Because several people involved in this case share the same surname, we refer to the parties by their first
names to avoid confusion; no disrespect or undue familiarity is intended.

accounts and CDs to her. Jerry claims that Mona was mentally incapacitated when she made the changes benefiting Wilda and that the changes were the result of undue influence exerted by Wilda. Following a four-day bench trial, the court awarded the 158 acres to Jerry and the jointly held bank accounts and CDs to Wilda. Wilda and Jerry both appealed the trial court's judgment.[2]

Wilda raises four points on appeal. She argues that the trial court erred in (1) finding that Mona and Jerry had a business partnership; (2) finding that Mona breached a fiduciary duty to Jerry when she deeded the 158 acres to Wilda; (3) finding that the property Mona deeded to Wilda belonged to the partnership; and (4) admitting evidence in violation of the statute of frauds.[3] Jerry raises five points on appeal. He argues that the trial court erred in: (1) finding that Wilda did not exercise undue influence over Mona because the court misapplied the law; (2) finding that Mona was competent to make the property distribution changes because that finding was against the weight of the evidence; (3) finding that the jointly held bank accounts and CDs were not partnership assets because that finding misapplied the law; (4) denying his request for attorney's fees and costs; and (5) denying his request for an accounting.

We affirm the trial court's judgment in all respects, with the exception of the trial court's denial of Jerry's petition for an accounting. On that issue alone, we reverse and remand for further proceedings consistent with this opinion.

---

[2] Wilda filed her Notice of Appeal on August 28, 2019, and her appeal was assigned case number WD83111. Jerry filed his Notice of Appeal on September 9, 2019, and his appeal was assigned case number WD83137. We consolidated the cases under the lower case number, WD83111. Pursuant to Rule 84.04(i) (Cross Appeals), Jerry, the plaintiff below, was deemed the appellant and Wilda the respondent for purposes of Rule 84.04. All rule references are to the Missouri Supreme Court Rules (2019).

[3] As explained *infra*, Wilda's first three points relied on do not conform to Rule 84.04 and, therefore, do not properly present issues for appellate review. Thus, for purposes of this opinion, Mona and Jerry entered into a partnership agreement that created a fiduciary relationship between them and Mona breached her fiduciary duty to Jerry when she conveyed the 158 acres to Wilda because that acreage was partnership property.

## Background

For many years, Mona and her husband Leman Wilson owned and operated a farm in Miller County, Missouri. After Leman's death in 1986, Mona needed help running the farm, so she made an offer to Jerry: if he would quit his full-time job as a heavy equipment operator and return to work on the farm, she would split the profits with him equally, and she would leave him approximately 158 acres of the farm upon her death. Jerry accepted Mona's offer, and the two orally agreed to form a partnership to operate the farm for profit. The business later expanded to include rental housing and a land lease for a cellular telephone tower.[4] In 1991, Mona executed a Durable Power of Attorney naming Jerry as her attorney in fact, but Jerry never used the Power of Attorney.

For the next 29 years, Jerry and his wife Jenny Wilson worked on the farm with Mona. Mona and Jerry divided equally all income from the farming operations, the rental houses, and the cell tower lease, and they deducted the expenses related to their businesses on their individual tax returns in roughly equal amounts.[5] Also, during the course of their business relationship, Mona opened several bank accounts and CDs identifying Jerry as a joint owner; neither Jerry nor Jenny contributed funds to those accounts or CDs. On April 22, 2004, consistent with her oral partnership agreement with Jerry, Mona executed two beneficiary deeds for the 158 acres; on the same day, she executed a beneficiary deed in favor of Wilda for a different 40 acres.

Then, in April 2015, Mona began to transfer funds in the bank accounts and CDs she jointly held with Jerry into accounts that were held by Mona with Wilda designated as a joint owner or

---

[4] The property where the cell tower is located is part of the 158 acres at issue in this case. When the lease was created, the property was owned by Mona individually, but both Mona and Jerry jointly executed the lease and they split the rental income equally.

[5] Mona and Jerry acquired farming equipment and each contributed money for its purchase; the equipment included a 1976 backhoe, a brush-hog, two hay-cutting machines, a tractor blade, and a four-wheel all-terrain vehicle.

3

beneficiary. On April 1, 2015, Mona closed a safe deposit box she had held jointly with Jerry and Jenny and opened a safe deposit box jointly with Wilda. On April 8, 2015, Mona revoked her 1991 Durable Power of Attorney in favor of Jerry and executed a new one naming Wilda as Mona's attorney in fact.[6] On April 15, 2015, Mona was examined by her family physician, Dr. Griswold, who noted "mild cognitive decline" but found that Mona was competent to make decisions at that time. On April 23, 2015, Mona executed a quitclaim deed for the 158 acres in favor of Wilda.

On June 9, 2015, Jerry sued Mona for breach of fiduciary duty of loyalty and good faith and breach of contract. Ten days later, Jerry filed a petition for appointment of a guardian of the person and conservator of Mona's estate. Kenneth Oswald was appointed to represent Mona in the guardianship/conservatorship proceeding.[7] The probate court ordered a psychological evaluation of Mona and appointed Dr. Jennifer Stevens, a clinical psychologist, to perform the evaluation. Dr. Stevens examined Mona on August 25, 2015, and issued a report concluding, "At this point, Mrs. Wilson is a competent individual, able to manage her own money, take care of most routine daily activities, and shows no clinical signs of dementia or unordinary cognitive decline. She does not meet the diagnostic criteria for any mental diagnosis."[8] Dr. Stevens did not testify at trial in this case.

Also in August 2015, Mona moved in with Wilda. Mona suffered a mild heart attack and was hospitalized in January 2016. On February 2, 2016, a doctor noted that Mona had baseline dementia. On March 3, 2016, Mona was seen by Dr. Glenna Burton, M.D. and Ph.D., with the Center for Cognitive Disorders. Dr. Burton diagnosed Mona with moderate to severe "Dementia, NOS[,] presumably Alzheimer's Disease," and admitted her to the hospital for treatment of

---

[6] Wilda did not use the Power of Attorney to effectuate any of the property transfers at issue in this case.

[7] Oswald was later appointed guardian ad litem for Mona in the litigation underlying this appeal.

[8] On April 12, 2016, the probate court entered judgment denying Jerry's petition for appointment of a guardian/conservator for Mona.

4

paranoid delusions and dementia. Following her hospital stay, Mona was discharged to be followed as an outpatient with the recommendation that she continue her current medication. At some point thereafter, Wilda used her Power of Attorney to have Mona admitted to a long-term care facility.

On June 13, 2016, Jerry filed a first amended petition adding Jenny as a plaintiff and Wilda as a defendant and adding four claims—tortious interference with a business relationship against Wilda, petition to set aside deeds, petition to set aside gifts, and petition for an accounting. On August 24, 2016, Jerry and Jenny filed a second amended petition making minor changes. Mona died on March 26, 2017. Thereafter, Jerry and Jenny filed their third amended petition, the operative petition here, to substitute Mona's estate as a party defendant. Wilda filed a counterclaim.

A bench trial was conducted over four days in 2018. As to the issues properly raised on appeal, Jerry testified that he filed the petition for guardianship and conservatorship due to concerns about Mona's ability to care for herself. She would turn her dirty clothes inside out and keep wearing them, she claimed to talk to her deceased mother and husband, she "blew up" two microwave ovens, she could not program her television or keep her checkbook in order, she would hit her house when mowing her lawn, and she was a bad driver. When asked for evidence of Wilda's influence over Mona, Jerry testified that he once overheard Wilda telling Mona what to say when Mona called Jerry to request her portion of the cell tower rent. He also described how he used to mow Mona's lawn until Mona told him that she did not want him to do so anymore; then Wilda started mowing Mona's lawn. Those were the only instances of "undue influence" Jerry could recall.[9]

---

[9] The deposition of Barbara Bell, President of Citizens Bank of Eldon, was entered into evidence. Some of the bank accounts and CDs at issue were held at Citizens Bank. Bell, who had assisted Mona with her banking needs

5

Jenny testified that she started noticing changes in Mona's actions and character in 2012. Mona no longer understood checks or electronics; she began asking Jenny to sign checks for her, and Jenny tried to teach Mona how to use her microwave, but Mona did not understand. In December 2012, Mona wrecked her truck; she did not have enough money to pay for repairs, so Jenny paid and then Mona reimbursed her, but Mona later accused Jenny of stealing the reimbursement money. In late 2014, Mona became incontinent. She would wear her clothes repeatedly until she stained them, and then she would turn them inside out and keep wearing them; she would not bathe. And, in late 2014 and early 2015, when grocery shopping, Mona would stare at items on the shelves and buy the same items at multiple stores.

Dr. Eric Lenze, a board-certified geriatric psychiatrist who reviewed Mona's medical records and performed his own examination of her on September 16, 2016, opined that, to a reasonable degree of medical certainty, she lacked the ability to perform executive functioning in April 2015. Dr. Lenze testified that Mona was severely confused and paranoid when he examined her in 2016. "You aren't fine in 2015 and then severely confused in 2016. There are exceptions to this, but all of those exceptions can be safely ruled out in Mona's case."[10] Dr. Lenze also reviewed the evaluation performed by Dr. Stevens in August 2015 and concluded that there was ample evidence of dementia at that time. Dr. Lenze testified that Dr. Stevens's evaluation and conclusions were inaccurate.

Amy Moffett, who had been an investigator with the Missouri Department of Health and Senior Services, testified that she investigated three hotline calls regarding Mona. The first call,

---

for more than 30 years, testified in her deposition that she did not witness Wilda intentionally interfering with any of the account ownership or designation changes Mona began making in April of 2015.

[10] Dr. Lenze's assessment was consistent with Dr. Burton's conclusion that, "to a reasonable degree of medical certainty," there was a "very high probability that [Mona's] insight and judgment were very impaired for years prior to" March 2016. Dr. Burton did not testify at trial.

made April 16, 2015, alleged emotional and psychological abuse of Mona by Jerry, and the second call, made April 22, 2015, alleged emotional and psychological abuse as well as financial exploitation of Mona by Jerry. Moffett met with Mona on April 23, 2015. Moffett testified that Mona spoke coherently about the allegations; Moffett had no concerns about Mona's ability to articulate the issues involved in the complaints. Moffett found Mona to be "very sharp, very strong-minded." Moffett administered a St. Louis University Mental Status examination to determine Mona's mental status, and Mona scored 24 out of 30.

Mona told Moffett that Jerry had taken what he was going to take from her, and she was not going to allow him to have another dime. Mona also expressed fear of Jerry because he had threatened to put her in a nursing home. At the time of Moffett's interview, Mona was staying with Wilda because Mona was scared to be alone with Jerry; she had deeded property to Wilda and Jerry had yelled at Mona about it. Jerry would not give Mona receipts for farm expenses, so Mona could not tell if Jerry was being honest with her. Wilda was not present for the interview, and Moffett saw no evidence that Wilda was attempting to influence Mona's answers. Moffett determined that the first two calls were unsubstantiated because there was insufficient evidence to prove that Jerry was abusing Mona. Moffett interviewed Jerry, and he admitted to yelling at Mona about adding Wilda's name to bank accounts. Although Moffett found the calls unsubstantiated, she concluded that Mona feared Jerry.

The third hotline call, made around September 29, 2015, alleged psychological abuse and financial exploitation of Mona by Wilda. Moffett visited Mona on October 5, 2015. Mona remembered Moffett from their earlier meeting in April. The caller had alleged that Wilda was keeping Mona from contacting family and friends. Mona reported that she was fearful of Jerry and Jenny and would rather die than live with them. Again, Wilda was not present for the

7

interview, and Moffett saw no indication that Mona was being influenced by Wilda. Moffett determined that the third call was unsubstantiated.

Oswald, Mona's representative in the guardianship/conservatorship proceeding, testified that he met with Mona alone for about two hours on July 28, 2015, in connection with that proceeding. Mona was "very oriented to time, place, and date." Oswald saw no indication that Mona was unaware of the nature of the transactions regarding her property, unable to understand the legal consequences of her actions, or that she was subjected to any undue influence. Mona told Oswald that she was upset about property that she had purchased, but the property was titled in both her name and Jerry's name; Mona felt it was fair to divide her property the way she did beginning in April 2015. Oswald further testified that Mona was not the same person following her heart attack and hospital stay in early 2016; that is when he agreed to serve as her guardian ad litem in the underlying litigation.

Wilda testified that she first became aware that Mona was having problems with Jerry when he followed Mona to Wilda's house and yelled at Mona because she wanted to put Wilda's name on her checking account so Wilda could write checks for Mona. Wilda also testified that there was tension between Jenny and Mona. According to Wilda, Mona wanted to add Wilda to the bank accounts and CDs because Jerry had gotten everything and she wanted Wilda to share in the estate.

Following the trial, the court issued extensive findings of fact and conclusions of law. The court found that Mona and Jerry had entered into a partnership agreement to operate the farm, the rental houses, and the cell tower lease; that they had a fiduciary duty to one another; and that Mona violated the agreement and breached her duty to Jerry by deeding to Wilda property that had been pledged to Jerry as consideration for the partnership, although Wilda had not caused Mona to

8

violate the agreement. The court also found that a confidential relationship existed between Mona and Wilda, and Wilda obtained a benefit from the April 2015 property transfers. But the court concluded that Wilda "did not exercise undue influence over Mona Wilson such that it resulted in deprivation of Mona Wilson's free agency in making those transfers." And the court noted that, before the transfers, Mona had expressed fear of Jerry, who admitted yelling at Mona, and there was evidence that Mona felt insulted by Jenny.

The court found that Mona "was severely impaired in March 2016 when she was examined by [Jerry's] expert witnesses but . . . was not so impaired in April of 2015 when she made the change in her accounts and real estate titles." The court further concluded,

> During the months of April through July of 2015, Mona Wilson was of sound mind in that she understood the ordinary affairs of life, the nature and extent of her property, the persons who were the natural objects of her bounty and that by executing Quit Claim deeds she was transferring property to the defendant Wilda Trusley. She also had contractual capacity in that she understood the nature and effect of those deeds after engaging in mature consideration and reflection.

> When Mona Wilson changed the ownership of her bank accounts and certificates of deposit she also had contractual capacity in that she understood the nature and effect of the transaction in which she was engaged after engaging in mature consideration and reflection.

Accordingly, the court found in favor of Jerry and Jenny on Counts I and II of the third amended petition—breach of fiduciary duty of loyalty and good faith and breach of contract, respectively, but awarded no damages on those counts. As to Count III—tortious interference with a business relationship—the court found in favor of Wilda. The court found in favor of Jerry and Jenny on Count IV—petition to set aside deeds—and ordered the setting aside of the quitclaim deed for 158 acres of property Mona executed in favor of Wilda in contravention of Mona's partnership agreement with Jerry. As to Count V—petition to set aside gifts—the court ruled in Wilda's favor, finding that Mona had the contractual capacity to transfer the bank accounts and

9

CDs to Wilda and that Mona was not unduly influenced by Wilda in making those transfers. On Count VI—petition for accounting—the court determined that Jerry and Jenny failed to establish the requisite elements for an accounting. Lastly, the court rejected Wilda's counterclaim against Jerry and Jenny. The court declined to award attorney's fees to any party and ruled that each party should bear its own costs.

The parties filed post-trial motions, which the court denied. Wilda appealed and Jerry cross-appealed.

## Standard of Review

"On review of a court-tried case, an appellate court will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Ivie v. Smith*, 439 S.W.3d 189, 198-99 (Mo. banc 2014) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). Statutory interpretation is an issue of law that we review de novo. *Id.* at 202.

## Analysis

### I. Wilda's Appeal

Wilda raises four points on appeal. She argues that the trial court erred in (1) finding that Mona and Jerry had a business partnership; (2) finding that Mona breached a fiduciary duty to Jerry when she deeded real property to Wilda; (3) finding that the real property Mona deeded to Wilda belonged to the partnership; and (4) admitting evidence in violation of the statute of frauds.

> **A. Wilda's first three points do not conform to Rule 84.04 and, thus, do not properly present issues for appellate review.**

We address Wilda's first three points together because they suffer from the same flaw— they do not conform to Rule 84.04. Where, as here, an appellate court is asked to review the decision of a trial court, "each point shall (A) [i]dentify the trial court ruling or action that the

10

appellant challenges; (B) [s]tate concisely the legal reasons for the appellant's claim of reversible error; and (C) [e]xplain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error." Rule 84.04(d)(1). "The point shall be in substantially the following form: 'The trial court erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error*], in that [*explain why the legal reasons, in the context of the case, support the claim of reversible error*].'" *Id.*

"The purpose of the points relied on is 'to give notice to the opposing party of the precise matters which must be contended with and to inform the court of the issues presented for review.'" *Hiner v. Hiner*, 573 S.W.3d 732, 735-36 (Mo. App. W.D. 2019) (quoting *Wallace v. Frazier*, 546 S.W.3d 624, 627 (Mo. App. W.D. 2018)). As this court has explained:

> Compliance with Rule 84.04 briefing requirements is mandatory in order to ensure that appellate courts do not become advocates by speculating on facts and on arguments that have not been made. Deficient points relied on force the appellate court to search the argument portion of the brief or the record itself to determine and clarify the appellant's assertions, thereby wasting judicial resources, and, worse yet, creating the danger that the appellate court will interpret the appellant's contention differently than the appellant intended or his opponent understood.

*Id.* at 736 (quoting *Wallace*, 546 S.W.3d at 627-28). Failure to comply with Rule 84.04(d) preserves nothing for review. *Hoover v. Hoover*, 581 S.W.3d 638, 640 (Mo. App. W.D. 2019).

Although Wilda's first three points identify the trial court's rulings challenged, the points fail to articulate the legal reasons supporting her claims of reversible error.[11] The points do not

---

[11] Wilda's first three points relied on are:

> Point I: The Trial Court erred in determining that Appellant sustained his burden of proof to establish by clear, cogent and convincing evidence that Appellant and his mother, Mona E. Wilson, created a partnership in the management and ownership of their farming operation, and in so doing committed reversible error.

> Point II: The Trial Court erred in finding that Defendant Mona E. Wilson owed a fiduciary duty to Appellant Jerry Wilson, and that her deeding property to her daughter,

11

indicate whether Wilda intends to argue that the court's findings lack substantial evidence, are against the weight of the evidence, or erroneously declare or apply the law. Moreover, Wilda's arguments under these points do nothing to clarify the nature of the claims she seeks to present. While it appears from Wilda's arguments that she is challenging whether sufficient evidence was presented and her brief recognizes that substantial-evidence and against-the-weight-of-the-evidence challenges are different, Wilda does not explain in the arguments under these points whether she is making a substantial-evidence or against-the-weight-of-the-evidence challenge. Notably, although her first three points appear to allege that Jerry failed to satisfy his burden of proof on various propositions, her arguments under these three points contain extremely limited citations to the evidence and testimony adduced during the four-day bench trial and refer to evidence favorable to *her* position only, citing *none* of the evidence that actually supports the trial court's findings in favor of Jerry. "Failure to follow the applicable framework means the appellant's argument is analytically useless and provides no support for his or her challenge." *Koch v. Koch*, 584 S.W.3d 347, 355 (Mo. App. S.D. 2019) (quoting *In re Marriage of Adams*, 414 S.W.3d 29, 34 (Mo. App. S.D. 2013)).

Because Wilda did not articulate the legal reasons for the alleged errors or explain how those legal reasons support her claims, she failed to provide notice of the "precise matters which must be contended with and to inform the court of the issues presented for review." *Hiner*, 573 S.W.3d at 735-36 (quoting *Wallace*, 546 S.W.3d at 627). "Under Rule 84.04, it is not proper for the appellate court to speculate as to the point being raised by the appellant and the supporting

Respondent Wilda L. Trusely, constituted a breach of that fiduciary duty, and in so doing committed reversible error.

Point III: The Trial [C]ourt erred in determining that Appellant Jerry Wilson sustained his burden of proof that the real estate conveyed by Defendant Mona E. Wilson to Respondent Wilda L. Trusley was "partnership property," and in so doing committed reversible error.

legal justification and circumstances." *Nichols v. Div. of Emp. Sec.*, 399 S.W.3d 901, 903 (Mo. App. W.D. 2013) (quoting *Martin v. Div. of Emp. Sec.*, 384 S.W.3d 378, 384 (Mo. App. E.D. 2012)). "Speculation on [a respondent's] arguments is not permitted by the appellate courts because such speculation would 'cast the court in the role of an advocate for the appellant.'" *Id.* (quoting *Martin*, 384 S.W.3d at 384).

We cannot consider the claims made in Wilda's first three points given her complete failure to comply with the briefing requirements applicable to substantial-evidence or against-the-weight-of-the-evidence challenges to factual findings made after a bench trial. Therefore, Wilda's Points I, II, and III are denied.

### B. The trial court did not violate the Missouri statute of frauds by admitting evidence of Mona's commitment to convey certain real property to Jerry.

For her final point, Wilda argues that the trial court erred in admitting evidence of Mona's commitment to convey certain real property to Jerry because that evidence is barred by the statute of frauds.

In pertinent part, the Missouri statute of frauds states,

> No action shall be brought . . . upon any contract made for the sale of lands, tenements, hereditaments, or an interest in or concerning them, or any lease thereof, for a longer time than one year, or upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized.

§ 432.010.[12] Because the agreement between Mona and Jerry did not involve the sale or lease of property, we interpret Wilda's statute-of-frauds argument to be based on § 432.010's reference to "any agreement that is not to be performed within one year from the making thereof." But "[a] partnership agreement [such as the one here] with no specific time limit is a partnership at will and

---

[12] All statutory references are to the Revised Statutes of Missouri (2015).

may be dissolved at any time." *Downey v. McKee*, 218 S.W.3d 492, 496 (Mo. App. W.D. 2007). Thus, § 432.010 does not apply to the partnership agreement between Mona and Jerry because that agreement was terminable within one year. *Id.*

Assuming, for the sake of argument, the agreement between Mona and Jerry could somehow qualify as a contract for the sale of land—a finding we do not make—the statute of frauds still would not bar evidence of the agreement because "[a]n oral contract is valid and enforceable, irrespective of the statute of frauds when there is proof of partial performance in furtherance of the agreement." *Piazza v. Combs*, 226 S.W.3d 211, 222 (Mo. App. W.D. 2007) (quoting *Shumate v. Dugan*, 934 S.W.2d 589, 592 (Mo. App. S.D. 1996)).

> A party may avoid the bar of the statute of frauds if the party has performed acts that, in themselves, are evidence of the existence of a contract to convey. The acts must have been done in reliance on the contract, and the positions of the parties must have been so materially changed that it would be grossly unjust to allow the other party to rely on the statute of frauds. If partial performance is established, the party asserting a contract exists may introduce parol evidence of the verbal terms of the contract. If by such parol evidence the complete, definite, fair contract to convey that has been pleaded is proved by clear, cogent, unequivocal, and convincing testimony, such party is entitled to relief.

*Id.* at 223 (quoting *Johnson v. Cook*, 167 S.W.3d 258, 264 (Mo. App. E.D. 2005)).

Here, the trial court found that Mona offered to convey 158 acres of her property to Jerry in consideration for his agreement to return home and run the family farm with her. The evidence shows that Jerry performed his half of the bargain for more than 29 years. The court concluded that "[t]o deny Jerry Wilson the consideration for that agreement would result in an unjust and deep[-]seated wrong." We agree. Jerry acted in compliance with his oral agreement with Mona. His actions were material, and they constituted partial and substantial performance of the agreement. He is entitled to its benefit.

Wilda's Point IV is denied.[13]

## II. Jerry's Cross-Appeal

On cross-appeal, Jerry raises five points. He argues that the trial court erred in: (1) finding that Wilda did not exercise undue influence over Mona because the court misapplied the law; (2) finding that Mona was competent to make changes to the disposition of her property because that finding was against the weight of the evidence; (3) finding that the CDs and bank accounts were not partnership assets because that finding misapplied the law; (4) denying Jerry's request for attorney's fees and costs; and (5) denying his request for an accounting. We address each point in turn.

### A. The trial court did not misapply the law in concluding that Wilda exerted no undue influence over Mona in connection with the April 2015 property transfers.

In his first point, Jerry claims the trial court erred in concluding that Wilda exercised no undue influence over Mona because the conclusion rested on a misunderstanding or misapplication of the law. There are two ways to prove undue influence: (1) by establishing a presumption of undue influence, which goes unrebutted, permitting the factfinder to find undue influence; and (2) by adducing evidence that proves undue influence by clear, cogent, and convincing evidence. *Cima v. Rhoades*, 416 S.W.3d 320, 324 (Mo. App. E.D. 2013). Jerry faults the court both for applying the wrong standard (the presumption of undue influence standard) and for applying that standard incorrectly; he argues that the evidence established the presumption here and shifted the burden of proof to Wilda, who failed to meet it.

"Undue influence occurs when a party in a position of trust induces the other, by 'active conduct,' to provide a substantial benefit through the transfer of property." *Nestel v. Rohach*, 529

---

[13] Wilda also complains that Jerry was allowed to testify at trial regarding the contents of Mona's will but no such document was produced. This argument exceeds the scope of the point relied on and, thus, is not preserved for appellate review. *The Schumacher Grp., Ltd. v. Schumacher*, 474 S.W.3d 615, 624 n.11 (Mo. App. W.D. 2015).

S.W.3d 841, 845 (Mo. App. W.D. 2017) (quoting *Duerbusch v. Karas*, 267 S.W.3d 700, 708 (Mo. App. E.D. 2008)). "Undue influence itself is usually defined as such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another." *Id.* at 846 (quoting *In re Estate of Hock*, 322 S.W.3d 574, 579 (Mo. App. S.D. 2010)).

Undue influence is presumed when the following elements exist: "(1) the existence of a confidential or fiduciary relationship between the settlor and the beneficiary, (2) the beneficiary is given a substantial benefit, and (3) the beneficiary was active in procuring execution of the document conferring the benefit." *Cima*, 416 S.W.3d at 324. Here, the court determined that the first two elements—a confidential relationship and a substantial benefit—were present but the third element—active procurement—was not. Thus, the court's finding would support that Jerry and Jenny failed to trigger the presumption, and the burden of proof never shifted to Wilda. But, in this case, it was not necessary for the court to apply the presumption.[14]

"In cases tried by juries, the presumption of undue influence operates to create a submissible question for the jurors . . . ." *Id.* "However, a court-tried case demands less concern for the question of a 'prima facie case,' and in such cases the trial court, as factfinder, has considerable discretion in the order of taking evidence." *Id.*

> Therefore, in court-tried cases, the court need not specifically evaluate whether the contestant met the elements giving rise to a presumption of undue influence, but rather must only determine the ultimate question of fact: whether the [change in ownership or beneficiary designation] was the result of undue influence that deprived the settlor of his or her free agency.

*Id.* Because this was a bench-tried case, the court did not have to consider the elements required for the presumption but, instead, could have focused solely on the ultimate question of fact—

---

[14] In view of our ruling as to the standard for proving undue influence in a bench-tried case, we need not and do not address the standard of proof applicable to undue influence claims in jury-tried cases where the presumption applies.

whether the April 2015 property transfers were the result of undue influence that deprived Mona of her free agency. And where, as here, the court in a bench-tried case determined the ultimate question of fact, we will not find that the court misapplied the law of undue influence related to a presumption applicable in a case tried by jury.

"[U]ndue influence need not be proven by direct and positive testimony but may be inferred from all the facts detailed in evidence." *Metter v. Janssen*, 498 S.W.2d 581, 584 (Mo. App. 1973). But "[a] finding of undue influence cannot rest upon speculation and conjecture. Motive and opportunity alone are not enough." *Sweeney v. Eaton*, 486 S.W.2d 453, 456 (Mo. 1972).

The primary evidence that Wilda unduly influenced Mona came from Jerry's testimony at trial. Jerry testified that he once overheard Wilda telling Mona what to say when Mona called Jerry to request her portion of the cell tower rent. He also described how he used to mow Mona's lawn until Mona told him that she did not want him to do so anymore; then, Wilda started mowing Mona's lawn. Those were the only instances of "undue influence" he could recall. Additionally, both Amy Moffett and Kenneth Oswald, who each interviewed Mona outside the presence of Wilda, testified that they did not see any indication that Mona was subject to undue influence by Wilda. Moffett and Oswald also testified that Mona felt Jerry had received his share of her estate and she wanted to provide for Wilda. And Barbara Bell, President of Citizens Bank of Eldon, testified in her deposition that she did not witness Wilda intentionally interfering with any of the account ownership or designation changes Mona began making in April 2015.

After reviewing the evidence, the court determined, "There is no evidence that Defendant Wilda Trusley prevailed upon Mona Wilson to execute the documents" that changed ownership of the bank accounts and CDs. "In a court-tried case, whether a person exercised undue influence over another is a factual determination for the trial court." *Watermann v. Eleanor E. Fitzpatrick*

17

*Revocable Living Tr.*, 369 S.W.3d 69, 76 (Mo. App. E.D. 2012). Thus, it was the trial court's task to resolve the evidence and determine as a matter of fact whether the April 2015 changes were the result of such influence. *Cima*, 416 S.W.3d at 324. We defer to the trial court's factual findings. *Watermann*, 369 S.W.3d at 76.

Point I is denied.

### B. The trial court's finding that Mona was not severely impaired or incapacitated in April 2015 was not against the weight of the evidence.

For his second point, Jerry argues that the trial court erred by finding that Mona was not severely impaired or incapacitated in April 2015 because that finding was against the weight of the evidence, in that (1) Drs. Burton and Lenze concluded that Mona must have been severely impaired in April 2015; (2) lay witness testimony either lacked any probative force or else corroborated the doctors' conclusion; and (3) Dr. Stevens's report also corroborated the conclusion of Drs. Burton and Lenze.

"[A] claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment." *Ivie*, 439 S.W.3d at 205 (quoting *In re J.A.R.*, 426 S.W.3d 624, 630 (Mo. banc 2014)). "In other words, 'weight of the evidence' denotes an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact." *Id.* at 206; s*ee White v. Dir. of Revenue*, 321 S.W.3d 298, 309 (Mo. banc 2010) (stating that "weight" denotes probative value, not the quantity of the evidence). "The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong." *Ivie*, 439 S.W.3d at 206.

"When reviewing the record in an against-the-weight-of-the-evidence challenge, [we] defer[] to the circuit court's findings of fact when the factual issues are contested and when the

facts as found by the circuit court depend on credibility determinations." *Id.* "A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment." *Id.* "When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence." *Id.*

We "defer[] on credibility determinations when reviewing an against-the-weight-of-the-evidence challenge because the circuit court is in a better position to weigh the contested and conflicting evidence in the context of the whole case." *Id.* "The circuit court is able to judge directly not only the demeanor of witnesses[] but also their sincerity and character and other trial intangibles that the record may not completely reveal." *Id.* "Accordingly, this standard of review takes into consideration which party has the burden of proof and that the circuit court is free to believe all, some, or none of the evidence offered to prove a contested fact, and the appellate court will not re-find facts based on credibility determinations through its own perspective." *Id.* "This includes facts expressly found in the written judgment or necessarily deemed found in accordance with the result reached." *Id.* "Evidence not based on a credibility determination, contrary to the circuit court's judgment, can be considered in an appellate court's review of an against-the-weight-of-the-evidence challenge." *Id.*

Moffett, who interviewed Mona on April 23, 2015, testified that Mona spoke coherently about the hotline allegations and was able to understand them; Moffett found Mona to be "very sharp, very strong-minded." And Mona articulated her reasons for wanting to leave more of her assets to Wilda.[15] Oswald testified that he met with Mona alone for about two hours on July 28,

---

[15] Moffett interviewed Mona again on October 5, 2015, in connection with the third hotline call. Mona remembered Moffett from their earlier meeting in April. And Mona's concerns about Jerry remained consistent over time.

2015, in connection with the guardianship/conservatorship proceeding. Mona was "very oriented to time, place, and date," and Oswald saw no indication that Mona was unaware of the nature of the transactions regarding her property or that she was unable to understand the legal consequences of her actions. Mona told Oswald that she felt it was fair to divide her property the way she did beginning in April 2015. The explanation Mona gave Oswald for redistributing her assets was consistent with what she had told Moffett three months earlier.

Wilda also admitted Dr. Stevens's evaluation of Mona conducted on August 25, 2015. Dr. Stevens concluded that Mona was competent and able to manage her own money; she did not show signs of clinical dementia at the time of the evaluation. Dr. Stevens's evaluation as well as the observations of Moffett and Oswald all occurred much closer in time to April 2015.

In addition to their testimony about changes they observed in Mona, Jerry and Jenny presented evidence from two psychiatrists who examined Mona—one roughly 11 months and one roughly 14 months after April 2015. Both opined that Mona suffered from dementia, resulting in severe effects on her memory, concentration, and ability to reason. And both opined that, based on the severity of Mona's dementia in 2016 when they examined her, she would have lacked the ability to make decisions about her assets in April 2015.

The evidence of Mona's mental state and competency in April 2015 was conflicting. "When reviewing the record in an against-the-weight-of-the-evidence challenge, [we] defer[] to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court depend on credibility determinations." *Ivie*, 439 S.W.3d at 206. And, in a case involving conflicting testimony by expert witnesses, the trial court is free to accept the testimony of one expert and reject the testimony of another. *King v. F.T.J., Inc.*, 765 S.W.2d 301, 306 (Mo. App. W.D. 1988).

20

Based on the evidence, the trial court determined,

> When Mona Wilson changed the ownership of her bank accounts and certificates of deposit [beginning in April 2015] she . . . had contractual capacity in that she understood the nature and effect of the transaction in which she was engaged after engaging in mature consideration and reflection.

The judgment reflects the court's assessment that the testimony of third parties, including Dr. Stevens, who observed Mona in 2015, was more credible as to the issue at hand—Mona's competency in the spring and summer of 2015—than the testimony of those who evaluated her in 2016, including Drs. Lenze and Burton.

Having considered all the evidence, including that contrary to the judgment, we are not firmly convinced that the finding of Mona's competency in April 2015 was against the weight of the evidence. Because we "will reverse only in rare cases, when [we have] a firm belief that the decree or judgment is wrong," *Ivie*, 439 S.W.3d at 206, the trial court's judgment survives appellate scrutiny.

Point II is denied.

### C. The trial court did not misapply the law in finding that the bank accounts and CDs were not partnership assets.

In his third point, Jerry argues that the trial court erred in finding that jointly owned bank accounts and CDs were not partnership assets. Specifically, Jerry argues that, under both the common law of partnership and Missouri's Uniform Partnership Law, the accounts and CDs were partnership assets because (1) they were acquired with partnership funds (namely, income earned by the partnership) during the course of the partnership, (2) both parties did not intend to treat them as non-partnership assets, and (3) Wilda and Mona's estate had the burden of proof on the issue.

Section 358.080 (Partnership property) states,

21

1. All property originally brought into the partnership stock or subsequently acquired by purchase or otherwise, on account of the partnership is partnership property.

2. Unless the contrary intention appears, property acquired with partnership funds is partnership property.

3. Any estate in real property may be acquired in the partnership name. Title so acquired can be conveyed only in the partnership name.

4. A conveyance to a partnership in the partnership name, though without words of inheritance, passes the entire estate of the grantor unless a contrary intent appears.

Jerry argues that § 358.080.2 creates a presumption that the bank accounts and CDs, all of which were opened during the partnership, were partnership assets and that Wilda bore the burden of proving a "contrary intention"—an intention to treat the accounts and CDs as Mona's personal property.

Here, the evidence is that the bank accounts and CDs in question were opened during the course of the partnership by Mona with money that, per the terms of the partnership agreement, was her share of the partnership's earnings. With one exception, the accounts were originally jointly titled in Mona's and Jerry's names, but Jerry did not contribute to the accounts or CDs.[16] Because the accounts were funded solely by Mona with her earnings from the partnership, the accounts were not acquired with partnership funds and, thus, were not partnership assets under § 358.080.2.

Moreover, § 362.470 (Joint deposits) and a decision from this court interpreting that statute in the context of § 358.080 further support the conclusion that the accounts were not partnership assets. In pertinent part, § 362.470.1 states,

When a deposit is made by any person in the name of the depositor and any one or more other persons, whether minor or adult, as joint tenants or in form to be paid to any one or more of them, or the survivor or survivors of them and whether or not

---

[16] The one exception was a CD at Central Bank of Lake of the Ozarks. Mona purchased the CD in 2004, titled it in her name, payable on death to Jerry. That CD was redeemed for $4,570.39 in cash in July 2015.

22

the names are stated in the conjunctive or the disjunctive or otherwise, the deposit thereupon and any additions thereto made by any of these persons, upon the making thereof, shall become the property of these persons as joint tenants, and the same, together with all interest thereon, shall be held for the exclusive use of the persons so named, and may be paid to any one of such persons during his lifetime, or to any one of the survivors of them after the death of any one or more of them. The making of a deposit in such form, and the making of additions thereto, in the absence of fraud or undue influence, shall be conclusive evidence in any action or proceeding to which either the bank or trust company or any survivor is a party of the intention of all the parties to the account to vest title to the account and the additions thereto and all interest thereon in the survivor.

In *Schnuck v. Schnuck*, 912 S.W.2d 683, 685 (Mo. App. W.D. 1996), the appellant claimed that, under § 358.080.2, bank accounts funded with operating funds from a partnership were partnership property and not joint property belonging to the survivor. We rejected that argument, holding, "The current state of the law on joint bank accounts would seem to preclude holding that a partnership source of funds is controlling, with no evidence of undue influence, mental incapacity, mistake or fraud." *Id.* "[T]he joint account statutes dictate that the decedent's intent to pass the funds to the account survivor 'is conclusively established by an account arrangement which comes within the terms of the statute,' and subject only to evidence of fraud, etc." *Id.* (quoting *In re Estate of Hayward*, 884 S.W.2d 10, 14 (Mo. App. W.D. 1994)). "To rule for the appellant would be to *ipso facto* hold that the statutory law of partnership or the partnership source of funds in a joint account trumps the joint tenancy law, and this court declines such a ruling." *Id.*

Here, the bank accounts and CDs at issue were opened by Mona with her personal funds, in her name and Jerry's name as joint tenants. There is no allegation of fraud or mistake, and the allegations of undue influence are not related to the opening of the bank accounts and, to the extent they are relevant, as discussed *supra*, allegations regarding Mona's mental incapacity are unfounded. Thus, under § 362.470.1, Mona's act of designating the bank accounts and CDs as she

23

did is conclusive evidence of Mona's intent to vest title to the accounts in the survivor, whom she was free to designate, and we see no reason to void the survivorship effect of the accounts.

For these reasons, the trial court did not misapply the law when it found that the bank accounts and CDs were not partnership assets.

Point III is denied.

### D. The trial court did not err in denying attorney's fees and costs.

For his fourth point, Jerry argues that the trial court erred in denying his request for attorney's fees and costs. "Where the award of attorneys' fees is not mandatory, the granting or refusal to grant attorneys' fees by the trial judge is primarily discretionary and will not be disturbed absent the showing of an abuse of discretion." *Tupper v. City of St. Louis*, 468 S.W.3d 360, 374 (Mo. banc 2015) (quoting *Lapponese v. Carts of Colorado, Inc.*, 422 S.W.3d 396, 401 (Mo. App. E.D. 2013)).

"Missouri follows the 'American Rule' regarding attorney's fees, which provides that, absent statutory authorization or contractual agreement, each party bears the expense of his or her own attorney's fees." *Id.* But Jerry contends that an exception to the American Rule known as the "collateral litigation exception" applies here. "Where the natural and proximate result of a wrong or breach of duty is to involve the wronged party in collateral litigation, reasonable attorneys' fees necessarily and in good faith incurred in protecting himself from the injurious consequence thereof are proper items of damages." *Birdsong v. Child.'s Div., Mo. Dep't of Soc. Servs.*, 461 S.W.3d 454, 462 (Mo. App. W.D. 2015) (quoting *Essex Contracting, Inc. v. Jefferson Cnty.*, 277 S.W.3d 647, 657 (Mo. banc 2009)). "As this court has previously held, [however] in order '[f]or the collateral litigation exception to be applicable, the plaintiff must have incurred attorney's fees in a different cause of action, involving a different party, caused by a breach of

duty by the defendant.'" *Id.* (quoting *Collier v. Manring*, 309 S.W.3d 848, 853 (Mo. App. W.D. 2010)). In this case, it is not clear to us what the "different cause of action" is or who the "different party" is, but we need not resolve those issues because the only possibility is Count III of the third amended complaint, wherein Jerry and Jenny accuse Wilda of tortious interference with a business relationship—a claim on which Wilda prevailed. "A litigant must prevail to be entitled to attorney fees under any exception to the American Rule." *Motor Control Specialties, Inc. v. Labor and Indus. Rels. Comm'n*, 323 S.W.3d 843, 854 (Mo. App. W.D. 2010). Thus, we find that Jerry is not entitled to his attorney's fees under the collateral litigation exception.

Moreover, even if the collateral litigation exception applied here—a finding we do not make—a court is not *required* to award attorney's fees under the exception. *Kristen Nicole Props. v. Shafinia*, 500 S.W.3d 902, 907 (Mo. App. W.D. 2016). "[G]enerally, except where a contractual provision or statute provides for an award of attorney's fees, the trial court is granted 'broad discretion' to award or deny such fees." *Id.*; *see Goralnik v. United Fire & Cas. Co.*, 240 S.W.3d 203, 210 (Mo. App. E.D. 2007) ("The award of attorneys' fees is left to the trial court's broad discretion, and will not be overturned save for an abuse of that discretion."). We are not persuaded that the trial court's denial of attorney's fees in this case was an abuse of discretion.

Jerry also claims that he is entitled to his costs under Rule 77.01, which states, "In civil actions, the party prevailing shall recover his costs against the other party, unless otherwise provided in these rules or by law." But § 514.090 states, "Where there are several counts in any petition, and any one of them be adjudged insufficient, or a verdict, or any issue joined thereon, shall be found for the defendant, costs shall be awarded at the discretion of the court."

Here, the trial court ruled that the parties should bear their own costs. The third amended petition contained six counts. The trial court ruled in favor of Jerry and Jenny on three counts and

in favor of Wilda and/or Mona's estate on three counts. Where, as here, the petition contained several counts and half were "found for the defendant," costs are awarded at the trial court's discretion. § 514.090. And, in its discretion, the court declined to award costs to any party. We are not persuaded that the denial of costs in this case was an abuse of discretion.

Point IV is denied.

### E. The trial court erred in denying the petition for an accounting.

For his final point, Jerry argues that the trial court erred in denying his petition for an accounting. In support of the petition, Jerry and Jenny alleged that Wilda, utilizing Mona's Power of Attorney, improperly appropriated, invested, and wasted Mona's assets. Jerry and Jenny requested a judgment (1) ordering Wilda to provide an accounting of all property that has come into her possession and any transactions, disbursements or investments she made since becoming Mona's attorney in fact; (2) appointing a special fiduciary to take possession of all property and administer the role of power of attorney during the pendency of this action; and (3) ordering Wilda to repay any funds she improperly appropriated.

The trial court denied the petition for accounting, citing *Bossaler v. Red Arrow Corporation*, 897 S.W.2d 629, 630 (Mo. App. E.D. 1995), but that case involved a claim for an equitable accounting. In his post-trial motion, Jerry clarified that the basis of his claim for an accounting is legal; he claims he is entitled to an accounting under §§ 358.220[17] and 404.727.

In pertinent part, § 404.727.1 states,

> The principal [under a durable power] may petition the court for an accounting by the principal's attorney in fact or the legal representative of the attorney in fact. If

---

[17] In relevant part, § 358.220 states, "Any partner shall have the right to a formal account as to partnership affairs: (1) If he is wrongfully excluded from the partnership business or possession of its property by his copartners." Because Jerry brings his claim for an accounting against Wilda only, we need not address § 358.220, which deals with the right to accountings between co-partners. *See Finch v. Campbell*, 541 S.W.3d 616, 628 (Mo. App. W.D. 2017) ("Coupled with the duty to account is a partner's right to receive a formal accounting from his or her co-partners. . . . Section 358.220 sets forth the circumstances under which an accounting may be had.") (quoting *King v. Bullard*, 257 S.W.3d 175, 182 (Mo. App. E.D. 2008)).

26

the principal is disabled, incapacitated or deceased, a petition for accounting may be filed by the principal's legal representative, an adult member of the principal's family or any person interested in the welfare of the principal.

Jerry is an adult member of Mona's family, and Mona died in 2017, before judgment was entered. Accordingly, § 404.727.1 allows Jerry to petition the court for a formal accounting of Wilda's use of Mona's Power of Attorney. "Since under the statute a principal is required to 'petition the court for an accounting,' the statute, as at common law, requires a trial court to exercise its discretion in determining whether an accounting should or should not be ordered." *Williams v. Walls*, 964 S.W.2d 839, 849 (Mo. App. S.D. 1998). Here, the trial court erroneously denied the petition for an accounting based solely on *Bossaler v. Red Arrow Corporation*, 897 S.W.2d 629, 630 (Mo. App. E.D. 1995), which pertains to equitable accounting only. The judgment does not indicate that the trial court exercised its discretion in denying the petition. Rather, the judgment indicates that the court denied the petition because it did not meet the requisite *Bossaler* elements, which are inapplicable here.

Point V is granted.

### Conclusion

We affirm the trial court's judgment in all respects, with the exception of the trial court's denial of Jerry's petition for an accounting. On that issue alone, we reverse and remand for further proceedings consistent with this opinion.[18]

_____
Karen King Mitchell, Judge

Mark D. Pfeiffer, Presiding Judge, and Alok Ahuja, Judge, concur.

---

[18] Before submission of this case, Jerry filed a motion for attorney's fees on appeal, and we took the motion with the case. In his motion, Jerry argues that he is entitled to appellate attorney's fees under the collateral litigation exception to the American Rule. In light of our decision to affirm the trial court's judgment on attorney's fees, we deny Jerry's motion for the same reasons.

27